**UNITED STATES COURT OF  APPEALS**

**FOR THE FIFTH CIRCUIT**

---

NO. 97-50629

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee

VERSUS

ALLISON HASKELL JONES,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Western District of Texas

---

July 31, 1998

Before HIGGINBOTHAM, PARKER and DENNIS, Circuit Judges.

PARKER, Circuit Judge:

**I.**

**FACTS & PROCEDURAL HISTORY**

Allison Haskell Jones appeals his conviction for possession with intent to distribute marijuana in violation of 21 U.S.C. § 841 (a)(1).  Appellant was stopped by a border patrol agent on suspicion of smuggling aliens, while driving northbound on Texas state Highway 118 some eighty (80) miles north of the Texas-Mexico border.  In the district court, Jones made a motion to suppress the evidence from the search, which was denied, whereupon Jones pleaded guilty, reserving his right to appeal.

1

The facts relevant to Jones's motion to suppress are these. On March 8, 1997, a little after 7:00 a.m., Jones was driving northbound on Highway 118 in a blue Toyota 4 Runner,[1] about five miles south of Alpine, Texas, approximately four miles north of a fixed border checkpoint, and some eighty (80) miles north of the Texas-Mexico border. His lights were on, though it was after sunrise. United States Border Patrol Agent Luis Barrera was proceeding southbound on Highway 118 when he noticed Jones's oncoming vehicle. Barrera pulled onto the shoulder to observe Jones as he passed. Barrera noticed that the 4 Runner was covered in mud, which Barrera thought was fresh (not dry), even though Barrera was aware of no rainfall in the area in the previous several weeks. Barrera thought Jones looked like a tourist and did not recognize him from the area. Barrera also saw a blue tarpaulin draped over something in the rear cargo area of the 4 Runner.

Barrera decided to follow Jones. Barrera pulled in behind Jones at between fifty-five (55) and sixty-five (65) miles an hour. Barrera kept his cruiser within three car lengths of Jones and at one point got close enough to read the license plate, i.e., he was tail-gating Jones.[2] A license check revealed that the vehicle was registered to one Allison Jones of Garland, Texas. Jones was

---

[1]The Toyota 4 Runner is a sport-utility vehicle with a removable rear seat and a totally enclosed cargo area.

[2]At the suppression hearing, Barrera testified that a safe following distance at those speeds would be five to six car lengths.

continually glancing back at Barrera in the rear view mirror, and a couple of times let the 4 Runner slip off the pavement. Barrera noticed that the 4 Runner's right rear tail light was inoperative.

Barrera finally pulled Jones over and called his partner, Agent Scott Roddy, for back-up. When Agent Roddy arrived, Barrera approached the 4 Runner with a dog, which alerted to the vehicle immediately. Barrera asked Jones what his citizenship was and for him to produce his driver's license. Jones told Barrera that he was a United States citizen and handed Barrera his driver's license. Barrera could smell the odor of marijuana and deodorizer. Jones was visibly nervous. Agent Roddy asked Jones to exit the 4 Runner. Barrera put the dog inside the 4 Runner, where he alerted to contraband in the rear cargo area. Barrera looked through the rear side glass of the 4 Runner and saw flour or seed sacks. Barrera then raised the tarp and discovered 222.46 pounds of marijuana.

## II.

### LAW & ANALYSIS

#### A.

##### Standard of Review

"A district court's purely factual findings are reviewed under the clearly erroneous standard. The evidence presented at a pre-trial hearing on a motion to suppress is viewed in the light most favorable to the prevailing party. The conclusions of law derived

3

from a district court's findings of fact, such as whether a reasonable suspicion existed to stop a vehicle, are reviewed de novo." *United States v. Inocencio*, 40 F.3d 716, 721 (5th Cir. 1994), *citing United States v. Cardona*, 955 F.2d 976, 977 (5th Cir. 1992).

The question for this Court is whether, viewing the evidence in the light most favorable to the government, the district court erred by holding that Agent Barrera properly formed a reasonable suspicion of illegal activity upon observing a Toyota 4 Runner with its lights on at 7 a.m., covered in fresh mud, with an inoperative tail light and a blue tarp draped over something in the rear cargo area traveling northbound on Highway 118 (which comes from Big Bend National Park just on this side of the border), five miles south of Alpine, Texas, and approximately eighty (80) miles north of the Texas-Mexico border, driven by a middle-aged, tourist-looking, Caucasian male who had probably just come through the border checkpoint around shift change and who continually glanced back in his rear-view mirror when Agent Barrera decided to follow him? We conclude that the district court did err and therefore reverse Jones's conviction.

**B.**

**Roving Border Patrol Stops Under the Fourth Amendment**

Warrantless investigatory stops by border patrol agents which are not conducted at the border or its functional equivalent are

4

unconstitutional unless supported by a reasonable suspicion of illegal activity. *Inocencio, supra* at 722. "Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area." *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S. Ct. 2574, 2582, 45 L. Ed. 2d 607 (1975). Those factors include: (1) the characteristics of the area in which a vehicle is encountered; (2) proximity to the border; (3) the usual patterns of traffic on the particular road; (4) previous experience with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, e.g., erratic driving or obvious attempts to evade officers; (7) aspects of the vehicle itself, e.g., suitability of the design for concealment and transport of aliens; (8) appearance of the vehicle, e.g., appears heavily loaded; (9) vehicle has an extraordinary number of passengers; (10) persons in the vehicle are observed attempting to hide; (11) appearance of the driver or passengers, e.g., certain aspects of dress and haircut, may indicate that the driver or passenger is from Mexico. *Brignoni-Ponce*, 422 U.S. at 884-885, 95 S. Ct. at 2582 (citing cases). Also, "[t]his Court considers the fact that a vehicle may have recently crossed the border as a vital element in making an investigatory stop." *Inocencio*, 40 F.3d at 722, n. 6, *citing United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir. 1984). "Reasonable suspicion, however, is not limited to an

5

analysis of any one factor." *Id.* at 722. Rather, a finding of reasonable suspicion must be based on the "totality of the circumstances known to the agent and the agent's experience in evaluating such circumstances", *United States v. Castenada*, 951 F.2d 44, 47 (5th Cir. 1992), and "[i]n all situations the [agent] is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Brignoni-Ponce*, 422 U.S. at 885, 95 S. Ct. at 2582, *citing Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. Ed. 2d 889 (1968).

## C.

### Proximity to the Border

In cases of investigatory stops based on suspicion of illegal alien smuggling, "we have at times focused our inquiry initially on the question of whether the arresting agents could reasonably conclude a particular vehicle originated its journey at the border." *Cardona*, 955 F.2d at 980. The further the stop is conducted from the border, the less likely it is that the vehicle originated its journey at the border. *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir. 1984)("When the stop occurs a substantial distance from the border, we have found this element missing"). Our cases reveal no bright line, yet a car traveling more than fifty (50) miles from the border is usually viewed as being too far from the border to support an inference that it originated its journey there. *See Inocencio*, 40 F.3d at 722 n. 6.

6

Perhaps of more importance to this case, is the combination of distance from the border and the presence of several towns and a heavily traveled national park between the point where Jones was stopped and the border. *See Melendez-Gonzalez*, 727 F.2d at 411 (noting that, once a vehicle is a substantial distance from the border and there are towns between the location of the stop and the border, some independent reason must exist for the border patrol agent to conclude that the vehicle originated its journey at the border rather than at one of those towns).

This factor is totally missing from this case. Jones was too far from the border to support an inference that his journey originated at the border. Furthermore, on Highway 118, between the point where Barrera first observed Jones and the border, lies Big Bend National Park and the settlements of Study Butte and Terlingua. It was just as likely that Jones left before sunrise (hence the driving with his lights on) from one of those other locations on Highway 118 as it is that he started from the border. The only independent evidence which might arguably indicate that Jones was more likely to have started at the border is the presence of "fresh" mud on Jones' 4 Runner.

Viewing the evidence in the light most favorable to the government (the prevailing party) as we must, we accept the district court's finding that Jones's 4 Runner had a noticeable quantity of fresh mud on it. Moreover, this Court has no reason to

7

doubt that Agent Barrera sincerely suspected that the mud on the 4 Runner came from a possible crossing of the Rio Grande, because he was aware of no rainfall in Brewster County in the previous two to three weeks.  The question is whether it was reasonable for Agent Barrera to suspect that.  We conclude that it was not.

There are far too many places between Alpine, Texas, and the Texas-Mexico border for a vehicle to pick up fresh mud virtually any time of the year.  The testimony at the suppression hearing demonstrates that there are numerous ranch roads in the area that cross spring-fed creeks that flow year-round.  Bruce Bourbon, a park ranger at Big Bend, who was qualified to the court as an expert on local geology, testified that in March of 1997 there were many springs flowing in Big Bend, and that he knew of several park roads that had been muddy.  Mike Baskette, who kept the rainfall records for Terlingua, testified that many of the local roads cross Terlingua Creek, which always has some water in it.  He also keeps a store at Study Butte and sees much of the traffic that departs from Big Bend.  He testified that most of the people down there have mud on their cars.  Don Parkinson operates a ranch, rock shop, and tourist center in Brewster County about 18 miles south of Alpine, and as a camping guide is very familiar with the state of the roads in Brewster County.  He testified that there are many tourists in Brewster County and most of them have muddy cars.  Indeed, the very road Parkinson lives on, which intersects with Highway 118 just south of the border checkpoint, is crossed by a

spring fed creek. Finally, rainfall records indicate that it had rained .10 inches on February 25 and .03 inches on March 1 at Alpine, Texas. In addition, rainfall had been heavy throughout the county during the month of February, 1997, with Alpine receiving 1.98 inches and Study Butte/Terlingua receiving .89 inches.

This court is unwilling to accept the notion that Agent Barrera was unaware of all the other places where Jones's 4 Runner might have picked up fresh mud between Alpine, Texas, and the border. In short, there is simply nothing suspicious about a muddy 4 Runner traveling in an area where one should expect most vehicles to have some mud on them.[3] Therefore, it was not reasonable to suspect that Jones's 4 Runner originated its journey at the border. This lack of origination at the border does not end the reasonable suspicion inquiry, but without it "the facts offered by the government to support a reasonable suspicion will be examined charily." *Inocencio*, 40 F.3d at 723, *citing United States v. Salazar-Martinez*, 710 F.2d 1087, 1088 (5th Cir. 1983).

**D.**

**Totality of the Circumstances**

There are several factual conditions which caused Agent

---

[3]We are naturally concerned that every distinguishing characteristic and its exact opposite will both be considered indicators of suspicious activity, creating a damned if you do, damned if you don't situation for citizens traveling near the border. A holding that too much dirt or mud is suspicious, combined with this Court's recent holding that not enough dirt or mud is suspicious would illustrate the point perfectly. *See United States v. Nichols*, No. 97-40843, slip op., 3524, 3539.

Barrera to suspect Jones was smuggling illegal aliens. First, Jones was driving at 7:00 a.m., after sunrise, with his lights on. The fact that Jones was driving with his lights on may indicate that he crossed the border or picked up illegal aliens on this side of the border before dawn. However, the fact that Jones was driving northbound on Highway 118 with his lights on at 7:00 a.m. five miles south of Alpine, Texas, is just as consistent with him being a tourist who left Big Bend National Park before dawn. Indeed, the latter possibility is far more likely, since, as noted by Agent Barrera, Jones looked like a tourist, and a license check revealed that he was from Garland, Texas. Second, Jones's vehicle was covered in fresh mud. Once again, as previously noted, it is far more likely that the mud came from one of the numerous other sources of fresh mud between Alpine, Texas, and the Texas-Mexico border, as opposed to the Rio Grande.

Third, Jones looked like a tourist, and Barrera had it on good authority that smugglers had recently engaged in the practice of using tourists or tourist-looking persons to bootleg illegal aliens, because they looked less suspicious. In other words, what was suspicious about Jones is that he looked like an unsuspicious tourist. A factual condition which is consistent with the smuggling of illegal aliens in a particular area, will not predicate reasonable suspicion, if that factual condition occurs even more frequently among the law abiding public in the area. For example, the fact that one is of Mexican national origin does not

create reasonable suspicion that one is an illegal alien, since, in border areas, there are far more legal citizens than illegal aliens of Mexican national origin. *Brignoni-Ponce*, 422 U.S. at 886-887, 95 S. Ct. at 2583. Something more must exist to set one person of Mexican national origin apart from all others of Mexican national origin which indicates that one is in the country illegally. Likewise, the fact that Jones looked like a tourist does not give rise to an inference of illegal activity, especially when the area is heavily traveled by tourists and is near a popular tourist destination, unless we are willing to say that tourists are involved in illegal activity often enough that just looking like a tourist is cause for suspicion. We are not so inclined.

Fourth, Jones had a blue tarp draped over something, which Agent Barrera suspected Jones might be using to conceal illegal aliens. One does wonder what the purpose of the blue tarp would be inside a fully enclosed sport-utility vehicle. Indeed, it would be a useful accessory when attempting to hide illegal aliens. However, it would also be useful to hide valuables from would-be auto-burglars. More importantly, such a tarp is a common camping accessory which can be found very often among the gear carried by tourists at Big Bend.[4] Given that Jones was not from the area, he looked like a tourist and was headed away from Big Bend on the

---

[4]Barnes, Baskette, Bourbon and Parkinson all testified that it was not at all uncommon to see tarps of varying colors among the gear carried by tourists at Big Bend.

11

highway most often used to access the park, the presence of the tarp would seem more indicative of a tourist coming from Big Bend than of an illegal alien smuggler. Indeed, nothing in Agent Barrera's own experience points to the contrary.[5] Therefore, the presence of the tarp in the back of Jones's 4 Runner was not cause to suspect that he was engaged in illegal activity.

Fifth, Agent Barrera noticed that Jones's right-rear brake light was inoperative, which indicated to him that the wiring might have been damaged by someone hidden in the cargo area or by someone hiding contraband within the side wall of the 4 Runner. Although Agent Barrera himself has never apprehended a drug smuggler or alien smuggler where the wiring harness to the tail lights was damaged by the smuggler's attempt to conceal his cargo, it is at least possible that such damage might occur as Agent Barrera suspected. Nevertheless, an inoperative tail light alone will not support reasonable suspicion. In combination with other suspicious circumstances, an inoperative tail light may provide corroborative evidence of illegal activity. However, it remains to be seen whether there are any other suspicious circumstances in this case, in combination with which the inoperative tail light may have some significance.

Sixth, Jones came through the checkpoint just before 7:00 a.m.

---

[5]Agent Barrera testified that only once had he stopped someone using a tarp to conceal contraband. In that case the tarp was over the bed of a pickup, where the cargo area is not otherwise enclosed.

Barrera testified that he had been informed by the DEA that smugglers had been engaging in the practice of coming through the border checkpoint south of Alpine at around the time of shift change, 7:00 a.m. This coincidence caused Barrera to think that Jones might be a smuggler who came through the checkpoint during shift change so as to avoid detection. The time frame in which a person passes a particular point in the road may indicate possible illegal activity, if other objective facts support a conclusion that persons passing a particular point at a particular time may be involved in illegal activity. *United States v. Cortez*, 449 U.S. 411, 420-21, 101 S. Ct. 690, 696, 66 L. Ed. 2d 621 (1981). Barrera testified that the DEA had informed the Border Patrol that smugglers were coming through the checkpoint at shift change to avoid detection. This factor does weigh in favor of reasonable suspicion. However, this Court has never held that the time of day when a vehicle comes through a border checkpoint alone is a basis for reasonable suspicion, nor will we go so far today. Nevertheless, the fact that Jones came through the border checkpoint south of Alpine, Texas around the time of shift change should be viewed as part of the totality of the circumstances in this case that may add up to reasonable suspicion.

Finally, as previously noted, the behavior of a driver may support a reasonable suspicion. *Brignoni-Ponce*, 422 U.S. at 884-885, 95 S. Ct. at 2582 (citing cases). Therefore, if the driver of

13

a vehicle appears nervous at being followed or is so preoccupied by the presence of law enforcement as to allow his vehicle to drift off the road or across the center line, his behavior may reinforce the law enforcement officer's suspicion. However, when the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed. In this case, the fact that Jones continually glanced back at Agent Barrera in his rear-view mirror and subsequently drifted off the road-way does not give rise to reasonable suspicion. It was far more likely that Jones kept looking at Agent Barrera in his rear-view mirror because Agent Barrera was tailgating Jones, and Jones drifted off the pavement because he was looking in his rear-view mirror instead of where he was going. It should have occurred to Agent Barrera that Jones's behavior was the natural, innocent-man's response to being tailgated and not so much the apprehension of the guilty at being caught.

The totality of the circumstances does not support a reasonable suspicion of illegal activity. The fact that Jones, who was from Garland, Texas, and who Agent Barrera described as looking like a tourist, was driving northbound on Highway 118 approximately eighty (80) miles north of the Texas-Mexico border at 7:00 a.m., after sunrise, with his lights on in a Toyota 4 Runner with fresh mud on it with a blue tarp over something in the rear cargo area is far more consistent with Jones being a tourist coming from Big Bend

14

National Park than an alien smuggler or drug smuggler who crossed the Rio Grande before dawn that morning. The inoperative tail light and time period when Jones came through the checkpoint south of Alpine do not alter the inescapable conclusion that Agent Barrera lacked reasonable suspicion to make an investigatory immigration stop. Therefore, we must reverse Jones's conviction. REVERSED and REMANDED for further proceedings consistent with this opinion.