**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 97-51078**

_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**VERSUS**

**GUILLERMO CORONADO ALDACO,**
**also known as Juan Coronado Aldaco,**

**Defendant-Appellant.**

_____

Appeal from the United States District Court
for the Western District of Texas

_____

February 17, 1999

Before REYNALDO G. GARZA, POLITZ and BARKSDALE, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

### I. *Factual and Procedural Background*

At approximately 10:45 p.m. on April 4, 1997, Border Patrol Agents Rene Zamora ("Zamora") and Charles Grout ("Grout") were patrolling Highway 85. At that time, they saw a Suburban traveling eastbound toward Dilley, Texas heading away from the United States-Mexico border. When the agents first observed the Suburban it was approximately seventy-five or eighty

miles from the border and about seven miles from Dilley. The agents followed the Suburban because they suspected that it was the same vehicle they had seen earlier in Encinal, Texas, believed to be owned by a suspected alien smuggler. A license plate check revealed that the license plate was not the same as the alien smuggler's. However, Zamora believed that the license plates had been switched. This belief was based upon Zamora's knowledge that the alien smuggler in Encinal had a car lot with many cars and in his experience, alien smuggling often involves the changing of license plates.

The agents pulled alongside the Suburban and used a flashlight to illuminate its interior. The driver, Guillermo Coronado Aldaco ("Aldaco"), crouched down into his seat and did not look at the agents when they pulled up beside him. Zamora considered this conduct odd, but common for alien smugglers. Grout then looked through the Suburban's window with a flashlight and observed a package on the passenger's side and bulky objects covered with blankets in the back of the vehicle. Although no movement was apparent, the agents thought the bulky objects might be people. Consequently, the agents concluded that they had reasonable suspicion to conduct an immigration inspection.

The agents activated their red and blue lights, however, Aldaco did not stop for about a half mile. When Aldaco rolled down his window, Zamora immediately detected a strong odor of marijuana and recognized the bulky packages in the front passenger seat as bricks of marijuana wrapped in cellophane and duct tape. Aldaco consented to a search of the vehicle. The total weight of the marijuana seized from Aldaco's vehicle was 503 pounds.

An indictment charged Aldaco with possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a), and with illegal reentry into the United States after deportation in violation

2

of 8 U.S.C. § 1326. Aldaco filed a motion to suppress asserting that the marijuana seized was the result of an illegal detention by the Border Patrol agents. The district court denied the motion. Aldaco then entered a conditional plea of guilty to both counts of the indictment, reserving the right to appeal the denial of his motion to suppress. Aldaco was sentenced to two concurrent 80-month terms of imprisonment. This appeal followed.

## II. Standard of Review

We review the denial of a motion to suppress under two standards. *United States v. Rodriguez-Rivas*, 151 F.3d 377, 379 (5th Cir. 1998) (citing *United States v. Inocencio*, 40 F.3d 716, 721 (5th Cir. 1994). First, we review the district court's factual findings for clear error and view the evidence presented at a pretrial suppression hearing in the light most favorable to the prevailing party. *United States v. Villalobos*, 161 F.3d 285, 288 (5th Cir. 1998) (citing *United States v. Cardona*, 955 F.2d 976, 977 (5th Cir.), *cert. denied*, 506 U.S. 942 (1992). This Court will not conclude that a factual finding is clearly erroneous unless we are definite that a mistake has been committed. *Villalobos*, 161 F.3d at 288. Secondly, conclusions of law derived from the district court's factual findings are reviewed *de novo*. *United States v. Jones*, 149 F.3d 364, 367 (5th Cir. 1998). Therefore, the determination of whether reasonable suspicion existed to stop Aldaco's vehicle is reviewed *de novo*. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *Villalobos*, 161 F.3d at 288.

## III. Discussion

Roving Border Patrol agents may make a temporary investigative stop of a vehicle if they are "aware of specific articulable facts, together with rational inferences from those facts, that reasonably

3

warrant suspicion" that the vehicle is involved in illegal activities. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *United States v. Cortez*, 449 U.S. 411, 416 (1981). The factors that are considered in determining whether reasonable suspicion existed are: (1) proximity of the area to the border; (2) known characteristics of a particular area; (3) previous experience of the arresting agents with criminal activity; (4) usual traffic patterns of that road; (5) information about recent illegal trafficking in aliens or narcotics in the area; (6) the behavior of the vehicle's driver; (7) the appearance of the vehicle; and (8) the number, appearance and behavior of the passengers. *Brignoni-Ponce*, 422 U.S. at 884-85; *Inocencio*, 40 F.3d at 722. In analyzing whether reasonable suspicion existed, however, no single factor is determinative. *Jones*, 149 F.3d at 367. Thus, determining whether the Border Patrol objectively possessed reasonable suspicion "is a fact-intensive test, each case must be examined from the 'totality of the circumstances known to the agent, and the agent's experience in evaluating such circumstances.'" *Villalobos*, 161 F.3d at 288 (quoting *United States v. Casteneda*, 951 F.2d 44, 47 (5th Cir. 1992)).

Aldaco argues that the marijuana was discovered as a result of an illegal stop and that it should have been suppressed by the district court. He contends that the agents lacked reasonable suspicion to stop his vehicle because the factors that they cited for conducting the search did not reach the level of "reasonable suspicion." Aldaco asserts that the factors are too general. Aldaco maintains that his failure to look at the agents when they pulled alongside his vehicle was not suspicious because he was traveling at about fifty-five miles per hour on a wet, two-lane highway and thus had to keep his eyes on the road. Furthermore, there was no evidence that he had recently crossed the border. Aldaco also argues that he was not traveling during a shift change and the lack of predictability for roving patrols makes shift change an unimportant factor that cannot support

4

reasonable suspicion.

This Circuit has recognized that the proximity of a stop to the border is a paramount factor. *Inocencio*, 40 F.3d at 722 n. 6. When a stop occurs a substantial distance from the border, this element is missing. *Rodriguez-Rivas*, 151 F.3d at 380 (citing *United States v. Melendez-Gonzalez*, 727 F.2d 407, 411 (5th Cir. 1984)). A "substantial distance" from the border usually constitutes vehicles traveling more than fifty miles from the border. *Rodriguez-Rivas*, 151 F.3d at 380*; Inocencio*, 40 F.3d at 722 n. 7 (internal quotes omitted). If there is no reason to believe that the vehicle has traveled from the border, the remaining factors must be examined carefully. *Rodriguez-Rivas*, 151 F.3d at 380.

Aldaco's Suburban was first observed seventy-five or eighty miles from the border. Accordingly, Aldaco's vehicle was a substantial distance from the border. Therefore, Aldaco was not close enough to the border for the agents to reasonably presume that he had recently crossed the border from Mexico. Thus, this Court must examine the remaining *Brignoni-Ponce* factors carefully. *Id.* at 380.

The appearance of Aldaco's vehicle is another important factor which this Court must consider. Zamora testified that the agents suspected that Aldaco's Suburban was the same vehicle that belonged to a notorious alien smuggler whom they had seen earlier that day in Encinal, Texas. The agents came to this conclusion because Aldaco's Suburban was "almost identical" to the smuggler's vehicle. Moreover, Zamora knew that the alien smuggler owned a car lot with "a bunch" of cars on it. Thus, even though a license plate check revealed that the license plates were not the same, Zamora based upon his experience as an agent knew that smugglers often change license plates on vehicles as part of the transportation of illegal aliens. This Court finds the fact that Aldaco's

5

vehicle was almost identical to one owned by a notorious alien smuggler is significant. Zamora did not stop Aldaco's vehicle based solely on the fact that it was a Suburban. The stop was executed because the two vehicles were almost indistinguishable. Although the license plate check did not prove that the vehicle belonged to the alien smuggler, the common practice of switching plates adequately maintained the agents' suspicions.

Zamora testified that both agents observed bulky objects in the back of the Suburban and that they believed that these objects were people hiding underneath blankets. The record demonstrates that the majority of the 503 pounds of marijuana was placed in the back of the Suburban. Clearly, such a large amount of marijuana weighing the equivalent of approximately three adults could easily be perceived as illegal aliens hiding beneath blankets. Aldaco argues that this factor does not support reasonable suspicion because the agents did not actually see any movement and the bulky objects could have simply been electronic equipment covered up. This Court, however, finds that the bulky objects covered by blankets did contribute to the agents' reasonable suspicion.

Furthermore, there is no indication that Aldaco could have been a tourist returning from Big Bend or any other similar place that would make it commonplace to conceal objects or camping equipment under blankets.[1] *Jones* is one such case that addresses this type of situation. In *Jones*, the appellant was traveling on Texas Highway 118, about eighty miles from the border, and had a blue tarp draped over something in the back of a Toyota 4 Runner sport-utility vehicle. *Jones*, 149 F.3d at 369. As Zamora in this case, the Border Patrol agent in *Jones* believed that the tarp was being used to conceal the transportation of illegal aliens. This Court stated:

---

[1]This Circuit has noted that it would be commonplace for objects to be covered when the stop of a vehicle was in close proximity to Big Bend National Park. *Jones*, 149 F.3d at 369-70.

One does wonder what the purpose of the blue tarp would be inside a fully enclosed sport-utility vehicle. Indeed, it would be a useful accessory when attempting to hide illegal aliens. However, it would also be useful to hide valuables from would-be auto-burglars. More importantly, such a tarp is a common camping accessory which can be found very often among the gear carried by tourists at Big Bend. Given that Jones was not from the area, he looked like a tourist and was headed away from Big Bend on the highway most often used to access the park, the presence of the tarp would seem more indicative of a tourist coming from Big Bend than of an illegal alien smuggler. Indeed, nothing in . . . [the agent's] own experience points to the contrary. Therefore, the presence of the tarp in the back of Jones's 4 Runner was not cause to suspect that he was engaged in illegal activity.

*Id*. at 369. The facts in *Jones* are not present in this case. Aldaco was not in close proximity to Big Bend nor appeared to be a tourist. Thus, it was reasonable for the agents to suspect that the blankets were being implemented to hide illegal aliens. The record reveals that Aldaco's Suburban had tinted windows. Zamora stated that this is a common characteristic of alien smuggling vehicles, and thus added to his suspicion.

It is evident that an officer's experience is a contributing factor in determining whether reasonable suspicion exists. The record demonstrates that Zamora makes approximately eighty stops a month for illegal aliens and in seventy-five percent of these stops illegal contraband is found. Moreover, whenever Zamora has had the opportunity to patrol Highway 85, his stops have always resulted in finding illegal activity. Zamora's success rate when working Highway 85 was nearly one hundred percent. Clearly, Zamora has extensive experience and a keen sense when criminality is afoot on Highway 85.

It is well established that a road's reputation as a smuggling route adds to the reasonableness of the agents' suspicion. *United States v. Nichols*, 142 F.3d 857, 870 (5th Cir.), *cert. denied*, 119 S.Ct. 621 (1998); *Inocencio*, 40 F.3d at 723; *United States v. Ramirez-Lujan*, 976 F.2d 930, 933-34

7

(5th Cir. 1992), *cert. denied*, 507 U.S. 987 (1993). Zamora testified that Highway 85, a two-lane road, is frequently used by drug and alien smugglers who are trying to circumvent the immigration checkpoints. Again, Highway 85's extensive use as a drug and alien smuggling route is further illustrated by Zamora's number of arrests and stops on Highway 85 that are almost a hundred percent effective. Furthermore, Zamora testified that every time the agents conduct patrols on Highway 85 their stops always result in discovering illegal activity.

Zamora's suspicion was also enhanced by the rainy weather because smugglers erroneously assume that more check points will be closed and the agents will be less active. In addition, Zamora noted that Aldaco was traveling during shift change hours, near midnight. He also stated that traffic is usually scarce on Highway 85 after eight or nine o'clock in the evening.

Another important factor to consider in examining if reasonable suspicion existed for the stop is the behavior of the vehicle's driver. Zamora testified that Aldaco looked like he might have crouched down into his seat when the agents shined their flashlights on him. Zamora stated that many alien smugglers crouch down in their seats to avoid being identified by Border Patrol agents. That while slouching, alone, may or may not be a significant factor we look to overall behavior of the vehicle's driver. *Rodriguez-Rivas*, 151 F.3d at 381.

Zamora testified that Aldaco failed to look at the agents when they pulled up alongside of him and shined their flashlights into the interior of his vehicle. Zamora thought this conduct was odd, however, it is often what smugglers do. "They figure if they don't see us, we don't see them." The avoidance of eye contact may or may not be entitled weight; and it is simply one factor to consider in observing overall behavior. *See Nichols*, 142 F.3d at 868. However, "'[r]easonable suspicion should not turn on ophthalmological reactions of the appellant.'" *United States v. Pacheco*, 617 F.2d

8

84, 87 (5th Cir.1980) (quoting *United States v. Lopez*, 564 F.2d 710, 712 (5th Cir. 1977)).

We conclude that a substantial number of the factors to establish reasonable suspicion were present. Therefore, the immigration inspection conducted by the Border Patrol agents was proper. Furthermore, the Government urges for the first time on appeal that, in the alternative, we review this case under the good-faith exception. In that we are affirming the district court's holding of reasonable suspicion, it is not necessary to reach that contention.

## *IV. Conclusion*

We hold that when viewing the totality of the circumstances that the Border Patrol Agents did have reasonable suspicion based on articulable facts that Aldaco was engaged in the smuggling of illegal aliens. Therefore, the district court properly denied Aldaco's Motion to Suppress. Accordingly, the decision of the district court is hereby AFFIRMED.