**UNITED STATES of America**

**v.**

**Jesus Maria ALANIZ, III, et al., Defendants.**

**Case No. 5:17–cr–00464**

United States District Court, S.D. Texas, Laredo Division.

Signed 10/06/2017

---

101. Rec. Doc. 42.

Christopher Shawn Coker, U.S. Attorney's Office, Laredo, TX, for United States of America.

Claudia Valdez Balli, Balli Law Office, Arturo Villarreal, III, Office of the Federal Public Defender, Federal Public Defender, Laredo, TX, for Jesus Maria Alaniz, III, et al.

## ORDER

George P. Kazen, Senior United States District Judge

Before the Court is the Report and Recommendation filed by Magistrate Judge J. Scott Hacker. (Dkt. 50) Any party who wishes to object to a Magistrate Judge's findings and recommendations must serve and file written objections within fourteen days after being served with a copy of the findings and recommendation. Fed. R. Civ. P. 72(b)(2). The Court must conduct "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made". 28 U.S.C. § 636(b)(1)(C). If no specific objections are made, de novo review is not required. Instead, where there is no objection, the Court need only determine whether the report and recommendation is clearly erroneous or contrary to law. See United States v. Wilson, 864 F.2d 1219, 1221 (5th Cir. 1989). In this case, because no party has objected to Magistrate Judge Hacker's Report and Recommendation, the Court need not conduct a de novo review. The Court has carefully reviewed the Report and Recommendation and finds it to be neither clearly erroneous nor contrary to law.

Accordingly, the Court ACCEPTS the findings of fact and conclusions of law in the Magistrate Judge's Report and Recommendation. (Dkt. 50) Defendants' Motions to Suppress (Dkt. 34; Dkt. 42) are GRANTED.

## REPORT AND RECOMMENDATION

THE HONORABLE J. SCOTT HACKER, UNITED STATES MAGISTRATE JUDGE

A grand jury, in a two-count indictment, charged Defendants Jesus Maria Alaniz ("Alaniz") and Amy May Cadena ("Cadena") with conspiracy to possess and distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B), and possession with intent to distribute 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2. (Dkt. No. 23 ("Indictment") at 13). Alaniz filed a Motion to Suppress (Dkt. No. 34) that Cadena joined. (Dkt. Nos. 39, 42). Senior District Judge George Kazen referred the motion to the undersigned. (Dkt. No. 35). The government filed a response (Dkt. No. 43) pursuant to an Order of this Court (Dkt. No. 37).

On August 2, 2017, the undersigned held a Motion Hearing at which the parties presented argument and evidence, and two government witnesses testified. (Dkt. Nos. 45, 46, 47). The Court has considered the argument, evidence, testimony, and applicable law. For the reasons that follow, the undersigned **RECOMMENDS** that the District Judge **GRANT** Alaniz's and Cadena's Motion to Suppress (Dkt. Nos. 34, 42).

### FACTUAL BACKGROUND

On May 23, 2017, United States Border Patrol Agents ("BPA") Robert Sotero Gon-

zalez ("BPA Gonzalez") and Darren Garza ("BPA Garza") were working their assigned interdiction duties on Texas State Highway 359, a road having a single lane in either direction. At approximately 10:00 p.m., BPA Gonzalez was parked in a perpendicular position in an unmarked, black Ford F250 without radar at the intersection of Highway 359 and Farm-to-Market Road 2895 ("FM 2895"). He observed *three* vehicles (i.e., Jeep Commander, Dodge Ram, and red Saturn VUE) that appeared to be driving in tandem at a high rate of speed eastbound on Highway 359 towards Oilton, Texas. He believed that the vehicles were traveling above the speed limit. After having allowed all three vehicles to drive past him, BPA Gonzalez turned east to follow the vehicles, accelerating to catch up to the Saturn. He noticed that the driver of the Saturn started "overly pressing the brakes" and "going over to the shoulder of the road," allowing the agent's vehicle to pass. (Mot. Hr'g at 9:21 9:22 AM). From BPA Gonzalez's experience, it was common for alien and narcotics smugglers "to let people pass them so that [ ] nobody sees them." (Mot. Hr'g at 9:21:20).

Deeming this activity suspicious, BPA Gonzalez continued to tail the Saturn to read its license plate and to call it into dispatch. (Mot. Hr'g at 9:21 9:25:20 AM). While observing the Saturn, he noticed that the rear of that vehicle was "bouncing way too much." In fact, it "kept bouncing and bouncing and never stopped as [it was] traveling." (Mot. Hr'g at 9:25:45 9:25:50 AM). Again, from BPA Gonzalez's experience, this was indicative that the vehicle had a "little bit more weight" for a vehicle with only two passengers. (Mot. Hr'g at 9:26:03 AM). After calling dispatch with his

personal cellular telephone, BPA Gonzalez was informed that the Saturn was registered out of Freer, Texas, and not stolen. BPA Gonzalez soon called BPA Garza and explained to him what he had observed. Believing that the Saturn was either carrying aliens or narcotics, he further asked BPA Garza, who was driving a marked patrol unit, to observe the Saturn and thereafter conduct a traffic stop.

BPA Garza was parked right at the west entrance to Oilton, Texas, at Highway 359, allowing him to view vehicles traveling eastbound that same evening. Shortly after being contacted by BPA Gonzalez, BPA Garza observed *four* vehicles driving ahead of BPA Gonzalez's unmarked F250, a Dodge RAM; a Nissan Sentra; and a Jeep Commander, followed by the red Saturn VUE. It appeared to BPA Garza that the Saturn was "riding very low." [1] (Mot. Hr'g at 10:10:10 AM). Concluding that the Saturn was heavily laden, this seemed suspicious to him because he observed only two occupants in the vehicle—a driver and a front-seat passenger. Further adding to his suspicion, was that, in this area or "small stretch," there was a common trend of a lot of alien and narcotics smuggling, where they would drop off aliens or circumvent the checkpoint with narcotics or aliens. (Mot. Hr'g at 10:11:00 10:11:28 AM).

Once the Saturn passed by, BPA Garza drove out onto Highway 359, and attempted to catch up to the vehicle. When BPA Garza approached the Saturn, it had reduced its speed because the speed limit drops going into and through Oilton. At this point, the Saturn still appeared to be "riding a little lower." (Mot. Hr'g at

---

1. BPA Garza testified that the vehicle "was riding very low," which means "that the separation of the tires is dropped, your bumper looks like it is almost dragging on the floor." He further clarified that, here, the bumper was not about to hit the ground, but he could see "the separation of the tire as it was accelerating," where "the tail end of the vehicle was dropping down just a little bit more." (Mot. Hr'g at 10:10:05 to 10:11:00 AM).

10:12:00 AM). BPA Garza approached the Saturn travelling as close as one car apart from the vehicle, and he was only behind the Saturn for a short time [2], when the driver suddenly turned on his blinker. This was suspicious to BPA Garza because his marked (service) vehicle was only behind the Saturn for a short time, coupled with the fact that only places that the vehicle could have turned off were a parking lot to a local restaurant that was closed for the night and an adjacent street that leads down to the train tracks. When BPA Garza saw the blinker being utilized, he immediately turned on his service lights "to avoid them from fleeing to avoid the vehicle going into the brush" (10:14:30 AM), or "run over a kid or go into a house." (Mot. Hr'g at 10:21:50 AM). The Saturn, at that point, came to a stop, "pulling off the road a little bit." (Mot. Hr'g at 10:15:00 AM; 10:22:40 10:23:18 AM). After BPA Garza initiated a traffic stop, Alaniz and Cadena were identified as the driver and as a passenger in the Saturn, respectively. Finally, about 158 kilograms of marijuana was seized from inside the vehicle. Neither agent conducted or requested a traffic stop of the two or three vehicles preceding the Saturn, traveling eastbound on Highway 359.

## LEGAL STANDARD

■ The Fourth Amendment provides that " '[t]he right of the people to be free in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated....' " *Bond v. United States*, 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000) (quoting U.S. CONST. amend. IV). In the instant case, since the Border Patrol agents conducted an investigatory stop without a warrant, the government bears the burden of proving, by a preponderance of the evidence,

that the investigatory stop was constitutional. *United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). A United States Border Patrol agent's temporary detention of an occupant of a vehicle for investigatory purposes while on roving patrol is constitutional if, at a minimum, the agent reasonably suspects that an occupant of the vehicle is involved in illegal activity. *Id.* An unparticularized suspicion or hunch will not suffice; however, proof that an occupant of the vehicle is involved in illegal activity by a preponderance of the evidence is not required. *See, e.g., United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) ("That level of suspicion is considerably less than proof of wrongdoing by *a* preponderance of the evidence."); *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999) ("Reasonable suspicion requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence"). Rather, the agent's suspicion is reasonable if it is based on specific articulable facts and rational inferences that can be drawn therefrom. *See, e.g., Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. 2574; *United States v. Chavez–Chavez*, 205 F.3d 145, 147 (5th Cir. 2000).

■ A court may take into account *any* number of factors when determining whether an agent's suspicion was reasonable. These factors include, but are not limited to: "(1) an agent's experience in detecting illegal activity; (2) proximity of the area where the investigatory stop occurred to an international border; (3) the area's known characteristics for illegal activity; (4) information about recent illegal activity in the area; (5) the area's usual traffic patterns; (6) erratic driving or obvious attempts to evade agents; (7) the type

**2.** Notably, BPA Garza testified that he followed the Saturn for about one-half mile before initiating the stop. (Mot. Hr'g at 10:27:30 AM).

of vehicle and other characteristics of the vehicle known to the agents to be frequently used in illegal activity including whether the vehicle is riding low or its suspension is modified; [and] (8) the number, appearance, and behavior of the occupants of the vehicle." *Guerrero–Barajas*, 240 F.3d at 432–33 (setting forth the *Brignoni–Ponce* factors as viewed by the Fifth Circuit). *See also United States v. Brignoni–Ponce*, 422 U.S. 873, 884–85, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

▮ No single factor is determinative. *Guerrero–Barajas*, 240 F.3d at 432–33. The Fourth Amendment does not require an agent to eliminate all reasonable possibilities of legal activity before conducting an investigatory stop, nor must every factor weigh in favor of illegal activity for an agent to reasonably suspect that an occupant of a vehicle was involved in an illegal activity. *Id.* Further, courts do not count the factors in favor of a reasonable suspicion finding or compare them to the countervailing factors; rather, courts look to their "laminated total." *See United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (citation omitted). Otherwise innocent facts, taken together, can raise a reasonable suspicion in the mind of an experienced officer. *United States v. Holloway*, 962 F.2d 451, 459 (5th Cir. 1992). In assessing the totality of circumstances, courts are instructed to look to the collective knowledge of all agents, *United States v. Hernandez*, 477 F.3d 210, 215 n.13 (5th Cir. 2007), and apply an objective standard. *See United States v. Lopez–Gonzalez*, 916 F.2d 1011, 1013 (5th Cir. 1990).

**DISCUSSION**

Fifth Circuit law in roving patrol cases is based on *Brignoni–Ponce*. The Court thus begins its analysis of reasonable suspicion in the instant roving patrol stop with these factors.

**1.** *An agent's experience in detecting illegal activity*

▮ The Fifth Circuit has held that an officer's experience contributes to "determining whether reasonable suspicion exists." *United States v. Aldaco*, 168 F.3d 148, 151 (5th Cir. 1999). BPA Gonzalez is a veteran agent with eight years' experience, mostly working in the Hebbronville area. (Mot. Hr'g at 9:12:34 9:13:48 AM). Besides being assigned to checkpoint duties, brush duties, and highway duties, BPA Gonzalez has been assigned as a field training officer and to the highway interdiction team (Mot. Hr'g at 9:12:51 9:13:23 AM; Mot Hr'g at 9:15:52 9:15:54 AM). BPA Garza is a veteran agent with nine years' experience working along Highway 359 with duties that have included highway interdiction, check point patrol, and tracking illegal aliens in the brush. (Mot. Hr'g. at 10:06:16 AM 10:07:03 AM). Both agents received specialized training in highway interdiction from the High Intensity Drug Trafficking Areas (HIDTA) program. (Mot. Hr'g at 9:16:02 9:16:20 AM; Mot. Hr'g at 10:07:19 10:07:27 AM). HIDTA provided the agents, *inter alia*, extra training on the legality of traffic stops, which included legal study through common law. (*Id.*). Both agents' current schedules consist of roving patrol for about fifty hours per week around Hebbronville—30 miles east, 30 miles west, and 50 60 miles south. (Mot. Hr'g at 9:15:15 9:15:52 AM). The agents' training and experience are relevant because "a finding of reasonable suspicion must be based on the 'totality of the circumstances known to the agent and the agent's experience in evaluating such circumstances.'" *United States v. Jones*, 149 F.3d 364, 367 (5th Cir. 1998) (quoting *United States v. Casteneda*, 951 F.2d 44, 47 (5th Cir. 1992)). This factor weighs in favor of the reasonableness of the agents' suspicion.

### 2. *Proximity to the border.*

██ The Fifth Circuit has held that "[p]roximity to the border is a paramount factor in determining reasonable suspicion." *United States v. Garza,* 727 F.3d 436, 441 (5th Cir. 2013) (internal quotations omitted). "Stopping [a] vehicle as it move[s] away from the border, within 50 miles of it, creates a 'stand-alone inference that the vehicle's journey originated at the border.'" *United States v. Salazar,* 628 Fed.Appx. 265, 266 (5th Cir. 2015) (quoting *United States v. Soto,* 649 F.3d 406, 409 (5th Cir. 2011)).

**Defs.' Ex. 5 (cropped)**

██ Here, BPA Gonzalez first encountered the Saturn at the intersection of Highway 359 and FM 2895. At that time, Defendants were traveling eastbound on Highway 359 toward Oilton, Texas. (Mot. Hr'g at 9:19:00 AM). BPA Garza actually stopped the vehicle in Oilton, Texas, which is about two to three miles west of a U.S. Border Patrol checkpoint on that same highway. (Mot. Hr'g at 9:42:08 9:42:25 AM). The distance from Oilton, Texas, to Nuevo Laredo, Mexico, is approximately 36 miles. (Govt.'s Exhibit 2). As such, the proximity of the vehicle to the Texas–Mexico border thus weighs in favor of the reasonableness of the agents' suspicion.

### 3. *The area's known characteristics for illegal activity.*

██ An area's reputation as an alien or drug smuggling corridor is an exemplary characteristic embodied by this third factor. *Aldaco,* 168 F.3d at 152. Here, BPA Gonzalez testified that, he was positioned on Highway 359, where vehicles traveling eastbound would still have undocumented aliens before dropping them off to circumvent the checkpoint. (Mot. Hr'g at 9:18:05 9:18:53 AM). BPA Gonzalez further explained that there were numerous ways in which smugglers would utilize Highway 359 to bypass or circumvent the Border Patrol checkpoint, making Highway 359 ripe for alien smuggling. (Mot. Hr'g at 9:19:20 9:20:30 AM). Finally, BPA Garza testified that, in this area or "small stretch," there was a common trend of a lot of alien and narcotics smuggling, where they would drop off aliens or circumvent the checkpoint with narcotics or aliens. (Mot. Hr'g at 10:11:00 10:11:28 AM).

Courts have held that a highway that allows undocumented aliens to circumvent a border patrol checkpoint adds to the reasonableness of an agent's suspicion. *See United States v. Compian,* No. 2:16-CR-1045, 2017 WL 1650185, at *1 (S.D. Tex. May 2, 2017) ("Human smugglers commonly use FM 755 as a drop-off, where they unload undocumented immigrants so that the immigrants can circumvent the checkpoint on foot."); *United States v. Hernandez,* 477 F.3d 210, 211 (5th Cir. 2007) ("[A]liens follow ranch or county roads or walk about six hours through the desert from the Rio Grande, approximately eigh-

teen miles away, for pickup by smugglers on U.S. 83, north of any checkpoint.").

This factor, when viewed charily, supports the reasonableness of the agents' suspicion.

### 4. Information about recent illegal activity in the area.

 BPA Gonzalez testified his suspicion for criminal activity was heightened because Defendants were approaching the Border Patrol checkpoint at around 10:00 p.m. More specifically, BPA Gonzalez stated that the incident was occurring during a shift change for the Hebbronville Border Patrol station. He explained that smugglers know that, during a shift change, there is less law enforcement on the roads. Notably, an incident occurring at the time of a shift change can weigh in favor of reasonable suspicion. See United States v. Jones, 149 F.3d 364, 370 (5th Cir. 1998). BPA Gonzalez also testified that in this area, it is common for the temperature to reach 100 degrees. Consequently, alien smugglers will move people later in the day or when it is dark because they do not have to carry as much water, walking several miles around a checkpoint.

 BPA Gonzalez further noted that undocumented aliens are moved during this time of day, because during the daytime, the vehicles get way too hot because the sedans and SUVs sometimes cannot blow enough air for everybody. Of some significance, an agent's knowledge regarding the time of day or a particular day when smugglers pass through a particular area can add to the agent's reasonable suspicion. See, e.g., United States v. Orozco, 191 F.3d 578, 582 (5th Cir. 1999) ("[T]he majority of smugglers passed through that particular stretch of I–20 on weekends between 9 and 10 a.m."); United States v. Morales, 191 F.3d 602, 605 (5th Cir. 1999) ("The majority of the smuggling

detected by the Agent occurred between 9:30 10:00 a.m.").

This factor, when viewed charily, also supports the reasonableness of the agents' suspicions.

### 5. The area's usual traffic patterns.

 Another relevant factor to be considered is the "usual patterns of traffic on the particular road." Guerrero–Barajas, 240 F.3d at 432–33. BPA Gonzalez testified that he observed three vehicles (i.e., Jeep Commander, Dodge Ram, and red Saturn VUE) that appeared to be driving in tandem on Highway 359 towards Oilton, Texas. Observations of vehicles in proximity on a sparsely traveled road may raise an agent's suspicions. See United States v. Barnard, 553 F.2d 389, 392 (5th Cir. 1977). However, there is no other evidence to bolster the lead car-load car inference to which BPA Gonzalez testified.

In Barnard, for example, the Fifth Circuit gave weight to the fact that two automobiles were traveling in tandem, but noted that additional connecting factors, such as the observation of CB radios and the two vehicles having similar license plates, as significantly influencing its decision. 553 F.2d at 392. The Court of Appeals was specific that "[a]bsent ... connecting factors [ ], the proximity of the automobiles might seem ambiguous...." Id. at 392 n. 6. See also United States v. Lopez, 911 F.2d 1006 (5th Cir. 1990) (determining vehicles to be traveling in tandem when they were communicating with each other on CB radios); United States v. Miranda–Perez, 764 F.2d 285 (5th Cir. 1985) (holding that cars were driving in tandem when they were both new, both had California license plates on the rear only, and were observed traveling together for several miles).

Here, that Defendants were traveling in a vehicle on a single-lane highway further

minimizes any inference that Defendants were traveling in tandem with other vehicles. Likewise, BPA Garza testified that he observed three vehicles that passed him eastbound on Highway 359 and then returned, passing him again westbound. (Mot. Hr'g at 10:29 10:33 AM). The red Saturn VUE was *behind* these three vehicles and it did *not* pass BPA Garza westbound, thereby suggesting that the Saturn was not driving in tandem with the two or three vehicles preceding it.

This factor, when viewed charily, does little to support the reasonableness of the agents' suspicion.

### 6. *Behavior of the driver.*

■ This factor carries little, if any, weight in favor of the reasonableness of either agent's suspicion. When an agent's actions "are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed." *Jones*, 149 F.3d at 370. As BPA Gonzalez accelerated in his unmarked vehicle to catch up to the Saturn, he noticed that the driver started "overly pressing the brakes" and "going over to the shoulder of the road," allowing the agent's vehicle to pass. BPA Garza stated that, when he approached the Saturn in his marked unit, he was as close as one car apart from the Saturn, when the driver suddenly turned on his blinker. Yet there is "nothing suspicious about a driver changing lanes and slowing down when he realizes a vehicle is approaching from the rear; that is a normal reaction if the driver wishes to let the tailing vehicle pass." *United States v. Chavez–Villarreal*, 3 F.3d 124, 127 (5th Cir. 1993). This is especially true when a driver is adhering to the rules of the road by using blinkers.

Notably, after BPA Garza saw the Saturn's blinker, he immediately turned on his service lights "to avoid them from fleeing to avoid the vehicle going into the brush" (10:14:30 AM) or "run over a kid or go into a house." (Mot. Hr'g at 10:21:50 AM). Here, the undersigned is skeptical whether it is objectively reasonable for the agent to believe that a driver utilizing a blinker is somehow telegraphing that the vehicle is about to flee. In fact, it did not; the vehicle simply came to a stop.

### 7 & 8. *The particular aspects of the vehicle and the number, appearance, and behavior of the occupants of the vehicle.*

■ The Court considers together the aspects of the vehicle along with the characteristics of its occupants. First, BPA Gonzalez testified that the registration of the Saturn out of Freer, Texas, aroused his suspicion. From BPA Gonzalez's position on FM 2895, he assumed that the Saturn was coming from Laredo, Texas. Consequently, BPA Gonzalez believed that, by utilizing Highway 359, the driver of the Saturn was taking an indirect route from Laredo, Texas, to Freer, Texas. By observing Defendants' Exhibit 5, Highway 519 is the most direct route from Laredo, Texas, to Freer, Texas. And, assuming *arguendo*, that the Saturn came from some other place situated along Highway 359, it appears from that map that turning north on FM2895, instead of continuing eastbound on Highway 359 towards Oilton, Texas, would have also been a more efficient route to Freer. However, this observation is minimized due to the fact that Freer, Texas, is located in the general area and nothing else about the driver's route can be inferred, such as whether the driver was going to circumvent the upcoming Border Patrol checkpoint.

Second, as set out in detail above, the agents testified that the Saturn appeared to be heavily laden from each of their perspectives given that only two occupants

were visible. Here, Defendants argue that the Saturn was designed to seat up to five people comfortably and should have not appeared heavily laden if carrying only two people and approximately 350 pounds of marijuana. This argument lacks persuasiveness. BPA Gonzalez and BPA Garza appeared to be credible witnesses. Further, just because a vehicle is designed to transport five people does not prove that an equivalent amount of weight for five people would not cause an *older* Saturn to bounce on the highway or cause its tail end to drop down during acceleration.

This factor, when viewed charily, supports the reasonableness of the agents' suspicion.

9. *Absence of persuasive factors.*

■■■■ Finally, the Court notes the absence in this case of certain factors that the Fifth Circuit has considered persuasive in judging the validity of a stop by a roving patrol. *United States v. Melendez–Gonzalez*, 727 F.2d 407, 412 (5th Cir. 1984). For example, this case presents no evidence of erratic driving, *United States v. Walker*, 522 F.2d 194 (5th Cir. 1975) (three vehicles traveling at high rate of speed failed to stop at intersection and subsequently led agents on chase at speeds in excess of 85 miles per hour); no tip by informants, *United States v. Nunn*, 525 F.2d 958 (5th Cir. 1976); and no features on the defendants' vehicle that would make it a likely mode of transportation for illegal aliens, *United States v. Lara*, 517 F.2d 209 (5th Cir. 1975) (pick-up truck with camper shell); *United States v. Payne*, 555 F.2d 475 (5th Cir. 1977) (camper with blackened out rear windows equipped with air shock absorbers). Based on the totality of the circumstances, the absence of these factors as well as the unpersuasive nature of certain factors that were offered by the government leads this Court to conclude that the stop in this case was unlawful. *Melendez–Gonzalez*, 727 F.2d at 412.

## CONCLUSION

■■■■ The Fourth Amendment's core function is to safeguard the privacy and security of individuals from intrusive and arbitrary invasions by governmental officials. *Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The Fourth Amendment extends to protect the innocent and guilty alike. The government must prove that an investigatory stop is supported by reasonable suspicion. While this is an extremely close call, the undersigned finds that the government failed to establish its burden of proof. Accordingly, the undersigned **RECOMMENDS** that the District Judge **GRANT** Defendants' Motions to Suppress (Dkt. Nos. 34, 42) and therefore exclude all evidence from and as a result of the stop as fruit of the poisonous tree. *U.S. v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998); *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

## OBJECTIONS

Any party may file objections to this Report and Recommendation with the District Court within fourteen (14) days after receipt of this Report. 28 U.S.C. § 636(b)(1). A party filing objections must specifically identify those findings or recommendation to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir. 1982) (en banc) (quotations omitted)). A party's failure to file written objections to the findings, conclusions, and recommendation contained in this Report within fourteen (14) days after being served with a copy of the Report shall bar that party from *de novo* review by the District Court of those findings, conclusions, and recommendation and, ex-

cept upon grounds of plain error, shall bar the party from appellate review of the factual findings and legal conclusions accepted by the District Court to which no objections were filed. *Thomas v. Arn*, 474 U.S. 140, 150–53, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

**SIGNED this 15th day of September, 2017.**