**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

April 3, 2009

Charles R. Fulbruge III
Clerk

Nos. 08-10250

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

JESSE B. RODRIGUEZ,

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas, San Angelo Division

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

JENNIFER W. ELROD, Circuit Judge:

Defendant-Appellant Jesse B. Rodriguez entered a conditional guilty plea to counts one and two of a three-count indictment charging him with conspiracy to distribute and possess with intent to distribute 50 kilograms or more of marijuana and possession with intent to distribute 50 kilograms or more of marijuana. Rodriguez reserved the right to appeal the denial of his motion to suppress evidence seized in the traffic stop that led to his arrest. The district court sentenced Rodriguez to two concurrent terms of 262 months' imprisonment, followed by six years of supervised release, on each of the two counts. He now appeals the denial of his suppression motion. We affirm.

# I. FACTS AND PROCEEDINGS

Jesse B. Rodriguez entered a conditional guilty plea on two counts: (1) conspiracy to distribute and possess with intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. § 846, and (2) possession with intent to distribute 50 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C).  In his plea agreement, Rodriguez reserved the right to appeal the district court's oral order denying his motion to suppress the evidence seized in the stop and search of a vehicle he was driving.  Rodriguez filed a notice of appeal pro se without his counsel's knowledge, and his counsel filed another notice of appeal the following day. We consolidated the appeals for purposes of argument and we now consolidate them for disposition.  *See* Fed. R. App. P. 3(b)(2).

Agents Cody R. Hardin and Telefonso Coronado of the United States Border Patrol (USBP) testified at the suppression hearing, and their reports from the investigation were admitted into evidence.  The district court did not specify which evidence it was relying on when it ruled on Rodriguez's suppression motion. We consider the evidence in the light most favorable to the Government, as the prevailing party in the district court.[1]

## A.  Agent Hardin's Account

Agent Hardin advised that at approximately 6:45 am on September 27, 2007, he observed a dark maroon Chevrolet SUV (Chevy SUV) heading north on Highway 1024.  Highway 1024 is in a very remote, rural area.  Hardin lived in the area and was familiar with the traffic.  He did not recognize the Chevy SUV as being local traffic, and "knew it to be of the type commonly used to smuggle aliens."  Hardin declined to follow the vehicle, however, deciding to assist a

---

[1] *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001).

disabled school van instead. He reported to work at the Comstock, Texas USBP station. Around 9 a.m., he received a tip from a local rancher who was also familiar with traffic on Highway 1024. The rancher informed Hardin that he had observed a maroon vehicle, perhaps a Chevrolet Suburban, traveling north and south on Highway 1024, and that the rancher suspected the vehicle to be involved in illegal activity. Hardin stated that the rancher's "description matched exactly with the description of the vehicle I [Hardin] had observed earlier." Hardin and his supervisor drove up and down Highway 1024 searching for the Chevy SUV but did not find it. At approximately 9:45 a.m., another agent discovered footprints of roughly four suspected illegal aliens crossing the drag road[2] bordering Highway 90 west of Comstock. Hardin assisted that agent in tracking the suspected aliens, and informed his supervisor that the Chevy SUV he had spotted had probably picked up the individuals in question.

At this time, Hardin first reported seeing a "small silver colored Ford sedan ahead of me [Hardin] traveling north on Highway 1024." Hardin noted, with respect to the sedan: "There were two occupants . . . . I did not recognize this vehicle as being 'local traffic,' and mentally noted that there seemed to be a great deal of unusual traffic today." Hardin continued searching for the Chevy SUV, and next observed it traveling south on Highway 1024 past his location; he immediately followed it. He observed as the Chevy SUV stopped abruptly on the highway; three individuals ran from the brush towards the Chevy SUV and entered it; and then it sped off southward.

Hardin relayed his observations to other USBP agents, and another agent who was driving a marked patrol unit (Hardin's was unmarked) stopped it. The

_____

[2] A drag road, created by USBP by churning up dirt with tractor tires, is designed to preserve the footprints of suspected aliens for tracking purposes.

driver of the Chevy SUV was identified as Juan Goitia, a U.S. citizen; the three other occupants were Mexican nationals who were in the United States illegally. The fact that the individuals lacked food, water, or extra clothes, and that some had scratch-marks and chafed skin on their shoulders, led the agents to believe that they were involved in drug-smuggling. Hardin reported that Goitia admitted to USBP Agent Bud Kimzey that Goitia and the aliens with whom he was traveling had loaded the drugs into a gray or silver Ford Tempo. Goitia's wallet contained a piece of paper identifying a car. The slip of paper contained what appeared to be a car's Vehicle Identification Number (VIN), the words "'92 Ford Tempo" and "4D" (shorthand perhaps for "four doors"), and what appeared to be two license plate numbers.

Although Rodriguez was driving a silver or gray four-door Ford Tempo when he was stopped, it was not the Ford Tempo identified on the slip of paper; Rodriguez's Tempo contained a completely different VIN number and license plate, and was a 1991 model. Hardin attempted to explain this inconsistency at the suppression hearing. He testified that he had asked Goitia whether the vehicle identified on the piece of paper was the load vehicle for the drugs. Goitia had responded that it was not, but that it was in fact a *second* gray Ford Tempo. Hardin stated he had "f[ou]nd it hard to believe that we're—we saw a gray Ford Tempo traveling north on 1024 earlier and that that's the load vehicle, and now you [Goitia] have the vehicle's VIN number and license plates in your wallet." He further stated that he "didn't believe him [Goitia] at the time" he was questioning him. Hardin stated, however, that Goitia "swore to me . . . that this is a different Ford Tempo. He said, it looks just the same."

Hardin stated that he was informed (he did not say by whom) that one of the aliens in custody had confessed his involvement in narcotics trafficking to Kimzey, and that "the contraband had already been loaded into a little grey Ford

4

car." Hardin reported that "[t]his description matched the vehicle I had observed traveling north on 1024 earlier." Based on the fact that the driver of the Chevy SUV had a San Angelo, Texas address, and that the direction of travel might have been towards San Angelo,[3] Hardin concluded that the Ford's likely destination was San Angelo. Hardin relayed this information to San Angelo USBP agents and to a local sheriff's office in the form of a "be-on-the-lookout" alert, or BOLO. Hardin testified that the BOLO was for a "little gray or silver four-door Ford Tempo with two occupants in it. Driver has on a straw hat, heading north." It is unclear from the record whether the BOLO also contained the inconsistent information from the slip of paper regarding a Ford Tempo with a different VIN number, license plate, and model year.

**B. Agent Coronado's Account**

Coronado advised that the "local traffic pattern" for Highway 163, one of the highways where the agents spotted the Ford Tempo, was "basically oil-field workers, ranchers, and semi-trucks." He added that it was a good route for smuggling aliens and narcotics because there is very little law enforcement in the area, and no immigration checkpoints. He further stated that smugglers would commonly switch from Highway 1024 to Highway 163 to continue their smuggling.

Coronado stated that he had received a BOLO for an "older model," "four-door gray Ford Tempo" with two Hispanic male occupants, likely headed to San Angelo and containing marijuana. Based on the BOLO, he believed the car would be traveling on Highway 163 and then 67 towards San Angelo. Coronado stated that the Tempo was not the type of vehicle he typically saw in

---

[3] Hardin's report suggests the Tempo was headed towards San Angelo, but is not completely clear on the point.

the traffic he observed on Highway 163.

Coronado further stated that the "grey Ford Tempo observed by Agent Hardin traveling north on Highway 1024, just before the [Chevy SUV] was observed traveling south, was suspected as the possible load vehicle, which contained the contraband. Comstock [USBP] Agents relayed this information to the San Angelo Agents who conducted surveillance on road commonly used for alien/narcotics smuggling north from the Comstock region." Coronado specified that "just being a gray or silver Ford would not [in itself] make a vehicle unique or distinctive."

At about 2:30 p.m. that day, Coronado observed a grey 1991 Ford Tempo northbound at Highway 163 and Highway 190. (It was subsequently determined that Rodriguez was the driver of that Tempo.) Coronado advised that the Tempo's occupants looked at Coronado as they passed his vehicle, an unmarked Ford pickup. After looking at Coronado, the Tempo passenger turned to the driver, then slouched in his seat. Coronado stated that the driver of the Tempo was nervous at his presence (though his vehicle was unmarked, Coronado was in a uniform and Coronado stated he would have been visible from the Tempo).

As Coronado pulled in behind the Tempo to run its plates, the vehicle sped up. When Coronado closed the distance on the Tempo, the Tempo moved over to the shoulder of the road and slowed down. The Tempo remained at a slow speed on the shoulder for several miles (Coronado ran the license plate before the Tempo moved to the shoulder). The driver was looking in his rearview mirror frequently. He swerved over the yellow dividing line in the road several times; Coronado believed that was because he was looking backward rather than forward. Coronado called for backup because he was in an unmarked sensor pickup with no emergency equipment.

The record check of the Tempo's license plate reflected that the vehicle was

6

owned by a Betty A. Munoz of San Angelo, Texas. Coronado found that suspicious because both occupants of the Tempo were males and the owner was a woman; in his experience, education, and training, it was common for drug traffickers to use vehicles registered in other people's names. Coronado followed the Tempo northbound on Highway 163 until it turned northeast on Highway 67. The Tempo abruptly turned into a convenience store and parked. The driver entered the store and returned two or three minutes later; the passenger never exited the vehicle. The Tempo then backed out of the parking lot and pulled onto Highway 67. The two male occupants appeared to be visibly nervous and would not make eye contact with Coronado. Coronado followed the Tempo for about 50 miles in total.

During this time, Coronado was in radio contact with other USBP agents in the area, specifically Agent Corey Hodges, who was in San Angelo traveling on Highway 67 towards Coronado. Coronado requested assistance from Hodges in stopping the Tempo because Hodges was in a marked unit and had emergency lights. The Tempo continued northeast on Highway 67 until it passed Agent Hodges' location five miles southwest of Mertzon, Texas. Coronado stated that, on the basis of what he had observed and what Hardin had relayed, Coronado and Hodges initiated a traffic stop of the Tempo. The Tempo continued to travel slowly for a mile or a mile and a half after Hodges turned on his emergency lights before it stopped. On the basis of his experience, education, and training, Coronado stated he believed that the occupants of the Tempo had been "getting ready to bail out of the vehicle or looking for a side road to take." Upon his approach to the Tempo's driver's-side door, Hodges observed a large bundle of what he believed to be marijuana on the rear floorboard behind the passenger seat. Rodriguez was placed under arrest and handcuffed, and Coronado read him his *Miranda* rights. Rodriguez then consented to a search of the vehicle,

7

which yielded 176.5 pounds of marijuana. Only the legality of the stop is at issue here; Rodriguez does not challenge the validity of his consent.

## II. STANDARD OF REVIEW

We review the denial of a motion to suppress evidence according to a bifurcated standard: we review findings of fact for clear error and conclusions of law *de novo*. *United States v. Inocencio*, 40 F.3d 716, 721 (5th Cir. 1994). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole. Further, the evidence presented at a pre-trial hearing on a motion to suppress is viewed in the light most favorable to the prevailing party." *United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (citations, quotation marks, and punctuation omitted). The district court's overall finding that reasonable suspicion existed for the stop is a conclusion of law that we review *de novo*. *Inocencio*, 40 F.3d at 721.

## III. DISCUSSION

### A. Reasonable Suspicion Standard

Temporary, warrantless detentions of individuals constitute seizures for Fourth Amendment purposes and must be justified by reasonable suspicion that illegal activity has or is taking place; otherwise, evidence obtained through such a detention may be excluded. *Terry v. Ohio*, 392 U.S. 1 (1968). "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21; *see Jacquinot*, 258 F.3d at 427. Reasonable suspicion "requires more than merely an unparticularized hunch, but considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Gonzalez*, 190 F.3d 668, 671 (5th Cir. 1999). Courts determine whether the stop was reasonable by conducting a fact-intensive, totality-of-the circumstances inquiry. *Jacquinot*, 258 F.3d at 427. A "divide-and-

8

conquer" approach to this analysis is not permitted. *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (finding that "[a]lthough each of the series of acts was 'perhaps innocent in itself,' we held [in *Terry*] that, taken together, they 'warranted further investigation.'").

Factors that may be considered in an analysis of reasonable suspicion include:

> (1) proximity to the border; (2) characteristics of the area; (3) usual traffic patterns; (4) agent's previous experience in detecting illegal activity; (5) behavior of the driver; (6) particular aspects or characteristics of the vehicle; (7) information about recent illegal trafficking in aliens or narcotics in the area; and (8) the number, appearance, and behavior of the passengers.

*Jacquinot*, 258 F.3d at 427. No single factor is dispositive, and each case must be examined based on the totality of the circumstances known to the agents at the time of the stop and their experience in evaluating such circumstances. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

## B. Reasonable Suspicion Analysis

As stated above, the only issue in this case is whether the agents had reasonable suspicion for the stop. Rodriguez contends that five aspects of the exchange among the agents belie the district court's finding of reasonable suspicion. These are:

> 1. The "relatively nonspecific" nature of the BOLO report made by Hardin and relied upon by Coronado;
> 2. The long period of time between when Hardin first saw the Ford Tempo and when Coronado began to follow it, given the short physical distance;
> 3. The observation that Rodriguez's passenger crouched in his seat and that Rodriguez failed to look at Coronado;
> 4. The observation that Rodriguez glanced frequently in his rearview mirror and drifted from his lane of traffic, including moving over to the shoulder and slowing down; and

9

5. The observation that Rodriguez "abruptly" pulled into a convenience store after being followed.

In response, the Government claims that eleven "facts and reasonable inferences supported the investigatory stop." These are:

1. The agents' extensive experience and training;
2. The agents' extensive experience patrolling the relevant areas;
3. The status of the routes involved as known narcotics smuggling routes;
4. The prior apprehensions of narcotics smugglers on Highway 1024;
5. That Rodriguez's vehicle did not fit the usual traffic patterns;
6. That the agents did not recognize Rodriguez as a local resident;
7. That Rodriguez's vehicle was initially encountered less than 10 miles from the border;
8. That the front seat passenger moved back in his seat and crouched down upon spotting law enforcement;
9. That Rodriguez was traveling well below the posted speed limit;
10. That Rodriguez continuously looked in his rear-view mirror and swerved over the yellow highway dividing line; and
11. That the agents received specific information about Rodriguez's illegal activities, which was corroborated by eight different aspects of the agents' interaction with Rodriguez and the occupants of the Chevy SUV.

Rodriguez's claims will be assessed in turn.

*1. The BOLO Report*

"[A]n alert or BOLO report may provide the reasonable suspicion necessary to justify an investigatory stop." *Gonzalez*, 190 F.3d at 672.

Whether a particular tip or BOLO report provides a sufficient basis for an investigatory stop may depend upon [1] the credibility and reliability of the informant, [2] the specificity of the information contained in the tip or report, [3] the extent to which the information in the tip or report can be verified by officers in the field, and [4] whether the tip or report concerns active or recent

10

activity, or has instead gone stale.

*Id.* ("*Gonzalez* factors").  Rodriguez claims the BOLO report was not specific enough to support the stop and argues that it failed to specify the vehicle's license plate number, state of registration, and other distinguishing information. Review of this mixed question of law and fact is *de novo*.

As noted above, it is not clear whether the BOLO did contain a license plate number, albeit one that did not match Rodriguez's car.  More importantly, the Fourth Amendment does not require that a BOLO specifically include a vehicle's license plate number or registration information. The BOLO contained a great deal of detail, even though it was brief.  The BOLO's identification of a car by its make, model, body style, and by the number, ethnicity, sex, and attire of its occupants, on such a sparsely traveled road, might have been sufficient in itself to support a stop.  But Rodriguez fails to acknowledge that the agents did not stop the Ford Tempo solely as a result of the BOLO alert.  In fact, Coronado followed Rodriguez's Tempo for approximately 50 miles before directing Hodges to pull it over.  Although he was alerted to Rodriguez's car by the BOLO, Coronado also articulated other specific facts and rational inferences from those facts, detailed *supra*, that supported the stop.  *See Jacquinot*, 358 F.3d at 427.

In addition, the first, third, and fourth *Gonzalez* factors, unchallenged by Rodriguez, all favor the Government, even if the stop were understood to have resulted from the BOLO alert alone.  First, the "informant" was Goitia, the person who confessed to being involved in narcotics trafficking with Rodriguez. The slip of paper in Goitia's wallet contained information on a similar car, but the fact that the license plates on that slip of paper did not match Rodriguez's is not dispositive; as Goitia explained to the agents, the plates on the slip of paper belonged to a different Ford Tempo that the ring was also using for

11

smuggling. Even if Hardin also relayed the inconsistent information from the slip of paper, the fact that Rodriguez's car matched a lesser quantum of the information would not in itself vitiate the BOLO on these facts. We emphasize that we do not reach the question whether this BOLO itself would have been sufficient to provide reasonable suspicion for the stop.

The third and fourth *Gonzalez* factors clearly favor the Government: the tip was in fact verified to a significant extent by officers in the field, who observed the suspicious behavior of Rodriguez's car as they followed it for over 50 miles, and the report concerned not merely "recent" but in fact *contemporaneous* activity: ongoing drug-smuggling.

### 2. *The Long Period of Time between when Hardin First Saw the Ford Tempo and when Coronado Began to Follow it*

Rodriguez next contends that the three and one half hours he claims passed between when Hardin first saw the Ford Tempo and when Coronado first spotted it was much longer than the period of time it would have taken to drive the distance between these two points, which he maintains are 95 miles apart. He contends "the passage of time increases the probability that the suspicious vehicle followed a different route from that staked out by Agent Coronado or that the vehicle had already passed by the intersection he was observing."

The mere passage of time does not advance Rodriguez's argument much, however. There are many plausible reasons why Rodriguez might have ended up in the place where Coronado spotted him at that time rather than earlier. More importantly, review of this factual determination is for clear error, and Rodriguez has failed to make out this claim with any specificity, beyond noting the fact that Interstate Highway 10, an "acknowledged drug trafficking corridor," and another town (Ozona, Texas) were interposed between the two agents' locations. Perhaps that merely meant that Rodriguez stopped in Ozona

12

for lunch.  It is irrelevant.  He has cited no cases for what is, at bottom, his claim that the district court clearly erred in finding that his taking slightly longer to travel between points A and B than he would have had he been traveling non-stop at the speed limit undermined the reasonableness of the stop.   To call the district court's finding on this point "clear error" would be to deprive that term of all meaning.

### 3.  *The Body Language of Rodriguez and His Passenger*

Rodriguez next complains that the district court inappropriately considered the body-language response of Rodriguez and his passenger to the agents.  Coronado noted, as does the Government in its brief, that Rodriguez's passenger crouched down in his seat after looking at Coronado, and that Rodriguez failed to look at him when he was stopped in Barnhart, Texas. Where, as here, the appellant challenges the visual impressions and factual inferences of a law enforcement officer, the question is probably one of fact reviewable for clear error rather than one of law reviewed *de novo*, but the two frameworks yield the same result.

Rodriguez is correct that a suspect's failure to look at an officer adds little, if anything, to the reasonableness analysis.  *See United States v. Moreno-Chaparro*, 180 F.3d 629, 632 (5th Cir. 1998) (holding that "[w]e are persuaded that in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight.").   In its brief, the Government does not argue otherwise: the "failure-to-look" observation is not one of its asserted grounds of reasonable suspicion on appeal, although it may have been considered by the trial judge. It is unclear whether "crouching down," the Government's eighth asserted ground of reasonable suspicion, should be treated differently; if it is an effort to evade the eye of the law enforcement officer, it is conceivable that it could be.

13

But both these sub-claims are non-issues. The agents did not place much weight on them in the suppression hearing (especially the "failure-to-look" claim), and Rodriguez has provided no authority to the effect that agents are forbidden from considering them altogether (indeed, no such authority exists). Accordingly, this claim does not weaken the reasonable suspicion the Government claims supported the stop.

### 4. Rodriguez's Driving Behavior

Rodriguez's fourth challenge to the reasonableness of the stop centers on the weight the agents accorded his glancing frequently in the rearview mirror, crossing the yellow line in the road, and moving over to the shoulder and slowing down. This addresses the tenth ground the Government claims supported reasonable suspicion. The single case Rodriguez cites in support of this claim, *United States v. Jones*, 149 F.3d 364 (5th Cir. 1998), bolsters it only superficially. One question in *Jones* was whether looking at a law enforcement officer in the rearview mirror and drifting off the road as a consequence could support a finding of reasonable suspicion. *Id.* at 370–71. However, in that case, the officer was tailgating the suspect; the court thus found that "when the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed." *Id.* at 370. There is no allegation that any of the agents tailgated Rodriguez or otherwise caused him to drive in the erratic manner in which he was alleged to have driven. Therefore, Coronado's inferences based on Rodriguez's frequent glancing in his rearview mirror and swerving are not "destroyed." They were properly part of the totality of the circumstances that led to the stop. *See Arvizu*, 534 U.S. at 273) ("divide-and-conquer" strategy not valid against *Terry* totality-of-the-circumstances test). This is true under both the clear error and *de novo* standards of review.

14

### 5. *Rodriguez's "Abruptly" Pulling into a Convenience Store*

Rodriguez's final claim is that his decision to stop at a convenience store in Barnhart, Texas "after he had been followed for approximately twenty miles by a vehicle [driven by Coronado] that had refused to pass," along with the fact that Rodriguez had gone into the store for what "Agent Coronado decided was a suspiciously short period of time," could not "give rise to any additional suspicious inferences." For this proposition, and without explanation, he again cites *Jones,* 149 F.3d at 369–71. The *Jones* court held that a number of highly circumstantial pieces of evidence were insufficient as a basis of reasonable suspicion. We read this citation to contend that Rodriguez's brief stop at the convenience store is analogous to one or all of those pieces of circumstantial evidence. Review of this question, which goes to the totality of the circumstances, is *de novo*.

In *Jones*, the suspect "look[ed] like a tourist, was driving northbound on Highway 118 approximately eighty (80) miles north of the Texas-Mexico border at 7:00 a.m., after sunrise, with his lights on in a Toyota 4 Runner with fresh mud on it with a blue tarp over something in the rear cargo area"; the court found that that description, even in conjunction with the SUV's broken taillight, was "far more consistent with [defendant] being a tourist coming from Big Bend National Park than an alien smuggler or drug smuggler who crossed the Rio Grande before dawn that morning." *Id*. at 371.

The Government does not contend that the convenience store stop was one of its bases for reasonable suspicion. Coronado did mention it, however, in his report. Like many of the individual considerations the Government cites, this fact, in isolation, would not support a finding of reasonable suspicion. In this case, however, the Government can rely on other more probative sources of suspicion besides the one Rodriguez attacks here. Among the sources of

15

suspicion the district court could have credited were the BOLO report and Rodriguez's errant driving, as well as the road's status as a recognized corridor for narcotics and illegal alien smuggling and the agents' own experience in anti-smuggling operations. Therefore, the district court did not err in finding that reasonable suspicion supported the seizure, whether or not it considered Rodriguez's convenience store stop. Of the eight factors we mentioned in *Jacquinot*, 258 F.3d at 427, in describing the totality-of-the-circumstances test for reasonableness, only the first factor—proximity to the border—could conceivably be of assistance to Rodriguez (the Ford Tempo appears to have been close to the border when Hardin first saw it, but was not when it was ultimately stopped). All the other *Jacquinot* factors favor a finding of reasonable suspicion.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court.