# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2012

No. 09-30648

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FRANCISCO RICO-SOTO,

Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Louisiana

Before SMITH, GARZA, and SOUTHWICK, Circuit Judges
JERRY E. SMITH, Circuit Judge:

Francisco Rico-Soto was convicted, after being arrested at a traffic stop, of harboring illegal aliens. He appeals the admission of evidence obtained from the warrantless stop, claiming lack of reasonable suspicion. We affirm.

No. 09-30648

I.

U.S. Border Patrol Agent Harold Gill was patrolling Interstate 10 near Lake Charles, Louisiana, waiting at a spot where he could look into passing vehicles as they slowed at a curve.  That morning, he watched a fifteen-passenger van with "Paisanos" on it drive by, and he remembered that the Paisanos company had recently started transporting illegal aliens.  That "intel" came from reports in his and other Border Patrol sectors, where Paisanos vans were stopped at least three times in the past five months. At least one of those times, sixteen aliens were found in the van, and on at least one other occasion, there was evidence consistent with alien smuggling.

Gill had worked for the Border Patrol for 19½ years, ten of which were in Lake Charles.  Interstate 10 is a major travel route for smuggling illegal aliens to the Eastern Seaboard.  From his experience, Gill knew that smugglers often used fifteen-passenger vans.  He also was aware that vans that had already dropped off illegal aliens on the East Coast were usually passing westbound through his area of Interstate 10 between 9:00 a.m. and 12:00 p.m. on a return trip to the Mexican border.  He knew that such vans usually carried a driver, a co-driver, and one or two illegal aliens who had to return to the point of origin for some reason.

Gill had several concerns with the van.  First, he saw the passengers seated spaced out among the four rows instead of being grouped together.  He followed the van for three miles, during which time he checked the license plates and found that the van was registered not to the transportation company but to a woman named "Daisy Cruz" with a Houston address.  In Gill's experience, most vans used to transport illegal aliens are registered to unaffiliated women rather than to the company itself.  Still, during the entire time he followed the van, Gill did not see Rico-Soto, the driver, commit any traffic violation.

Determining that the van was likely returning from dropping off illegal

No. 09-30648

aliens, Gill signaled for it to pull over, and Rico-Soto immediately complied. Gill asked for the passengers' immigration documents, but they admitted that they had none. Rico-Soto produced a log of the passengers along with $7070 that he said was to be given to the transportation company after he deducted his pay.

II.

Rico-Soto was charged with harboring aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (B)(i). He moved to suppress the evidence seized during the stop, arguing it violated the Fourth Amendment. The district court held an evidentiary hearing and denied the motion. After a jury trial, Rico-Soto was found guilty. On appeal, he challenges only the denial of his motion to suppress.

III.

A law enforcement officer must have reasonable suspicion to justify warrantless investigatory stops of vehicles. *United States v. Banuelos-Romero*, 597 F.3d 763, 766 (5th Cir. 2010). Several Supreme Court opinions guide our inquiry into whether a vehicle's seizure is "reasonable" under the Fourth Amendment: (1) "[T]he officer must be able to point to specific and articulable facts which, when taken together with rational inferences from those facts, reasonably warrant that intrusion," *Terry v. Ohio*, 392 U.S. 1, 21 (1968); and (2) "[a]ny number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area. Officers may consider [the *Brignoni-Ponce* factors]."[1] We review a district court's determinations of reasonable suspi

---

[1] The *Brignoni-Ponce* factors, *see United States v. Brignoni-Ponce*, 422 U.S. 873, 884-87 (1075), include (1) the proximity to the border; (2) the characteristics of the area in which the agents encounter the vehicle; (3) the usual patterns of traffic on that road; (4) the arresting agent's previous experience with criminal activity; (5) information about recent border crossings in the area; (6) the vehicle's appearance; (7) the driver's behavior; and (8) and the number, appearance, and behavior of the passengers, *United States v. Rodriguez*, 564 F.3d 735, 741 (5th
(continued...)

No. 09-30648

cion *de novo*. *United States v. Zavala*, 541 F.3d 562, 574 (5th Cir. 2008).

The government presented several different elements that, when combined, led Gill reasonably to suspect criminal activity. First, he was positioned on Interstate 10, a major corridor for alien-smuggling between hub cities such as Houston and the East Coast. In particular, smugglers are often traveling westbound through Gill's region in the mid-morning, returning from eastbound trips. Gill has pulled over vans transporting illegal aliens on this route multiple times. A road's reputation as a smuggling route helps support an agent's reasonable suspicion. *See United States v. Aldaco*, 168 F.3d 148, 151-52 (5th Cir. 1999). Though these pieces of information provide only limited support for reasonable suspicion, the combination does show some factors Gill noticed that raise an experienced agent's suspicions in spite of the fact that tremendous amount of legitimate traffic uses Interstate 10 as well.

---

[1] (...continued)
Cir. 2009).

We recognize that because this stop was conducted by a roving Border Patrol agent for purposes of preventing illegal immigration, applying the factors in *Brignoni-Ponce*, 422 U.S. at 884-87, might be appropriate even though the stop occurred far from any border. *See, e.g.*, *United States v. Nichols*, 142 F.3d 857, 865 (5th Cir. 1998) ("[W]here the agents do not have reason to believe the vehicle has come from the border, 'the remaining [*Brignoni-Ponce*] factors must be examined charily.'"); *United States v. Inocencio*, 40 F.3d 716, 722-23 (5th Cir. 1994) ("[I]f the agents do not base the stop on the vehicle's proximity to the border, *Brignoni-Ponce* may still be satisfied if other articulable facts warrant reasonable suspicion."). This stop, however, occurred considerably farther from the border than did the stops in cases in which the *Brignoni-Ponce* factors are usually applied, and *Brignoni-Ponce* specified it was listing factors for "deciding whether there is reasonable suspicion to stop a car in the border area." *Brignoni-Ponce*, 422 U.S. at 884. No specific distance limit on *Brignoni-Ponce* has been set, *see United States v. Orozco*, 191 F.3d 578 (5th Cir. 1999) (discussing applicability of *Brignoni-Ponce* beyond 100 miles from the border), and we have not determined whether to cease using *Brignoni-Ponce* at some distance or whether that framework guides our analysis of any roving Border Patrol stop regardless of location.

We need not determine today whether the *Brignoni-Ponce* description of reasonable suspicion has a geographical limit, because applying either that test or the more general framework for investigative stops from *Terry v. Ohio*, 392 U.S. 1 (1968), leads to the same result: Rico-Soto's conviction is affirmed.

4

No. 09-30648

Various characteristics of the van and its passengers added to Gill's suspicion. The van was a fifteen-passenger model of the kind often used in transporting illegal immigrants. Moreover, it was registered not to a transportation company but to a woman with a Houston address. Vans used to transport illegal aliens are often registered to an individual woman rather than to the transportation company. The fact that this van was supposedly part of a company fleet, yet not registered to the company, understandably raised Gill's suspicions even further.

The quantity and arrangement of the passengers supported Gill's suspicion, although that factual detail provides little support on its own. First, when vans return from dropping off illegal aliens on the East Coast, they bring back a few aliens who could not pay or whom the company told to return. Gill noticed there were only a few passengers in the car—about the right number as would be expected for a return trip—and that they were seated in separate rows rather than clustered as people usually sit. That seating arrangement struck Gill as unusual, although without the other suspicious factors, it would be consistent with how strangers sit when using a commercial van service.

Finally, the strongest individual pieces of information come from the labeling on the van. Gill noticed the name "Paisanos" on the side; his agency's intel agent reported that Paisanos was a new player in transporting illegal aliens. Labeling and other information shown on a vehicle, in conjunction with relevant intel reports, can help raise reasonable suspicion.[2] The information was based on reports generated in various Border Patrol sectors, although Gill had not participated in any stops of Paisanos vans, and none had occurred in the Lake

---

[2] *See United States v. Puac-Zamora*, No. 94-10966, 1995 WL 337783 (5th Cir. 1995) (unpublished) (deciding that border patrol agents had articulable suspicion when they stopped a van with "Guatemala" on its front license plate and Florida on its back plate, based in part on intelligence reports that said that aliens from Guatemala were being moved from Florida to North Carolina).

No. 09-30648

Charles area.  Thus, in addition to the previous information he had gathered, Gill knew this van was operated by an organization that had recently become active in transporting illegal aliens.

Gill has worked for the Border Patrol for 19½ years, ten of which were in Lake Charles.  He has pulled over vans transporting illegal aliens in that area multiple times.  His extensive experience allows him to recognize suspicious circumstances that less-familiar outside observers might never realize were noteworthy.[3]  With his extensive experience, the combination of factors given above, many of which would be innocuous on their own, led Gill reasonably to suspect criminal activity.

Not only does each of these facts allow a reasonable officer to recognize criminal activity is afoot, but they trigger the various *Brignoni-Ponce* factors as well.  None of the factors alone is dispositive, and courts must analyze them as a whole, rather than each in isolation.  *Rodriguez*, 564 F.3d at 741.  Because this stop occurred more than fifty miles from the border, we examine the remaining factors charily.  *United States v. Olivares-Pacheco*, 633 F.3d 399, 402 (5th Cir. 2011).

Despite the lack of proximity to the border, examining the facts from the above analysis under the remaining *Brignoni-Ponce* factors demonstrates that Gill's stop was justified.  First, he made the stop on Interstate 10, a major alien-smuggling corridor.  Second, the van was traveling westbound through his location in the mid-morning, the main time, route, and direction Gill's past experience has shown smugglers pass by through the area.  Third, Gill's extensive experience in the Lake Charles area and with the Border Patrol generally leaves him keenly able to aggregate subtle clues the rest of us miss.  Fourth, intel

---

[3] *See United States v. Jacquinot*, 258 F.3d 423, 427 (5th Cir. 2001) (per curiam) ("Factors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers.").

No. 09-30648

reports showed "Paisanos" vans had recently become active in transporting illegal aliens and, though not yet apprehended in the Lake Charles region, they had been caught transporting illegal aliens in other places. Fifth, the vehicle was a fifteen-passenger van, often used in smuggling aliens, and was registered to an individual woman in Houston rather than the company to whose fleet it was labeled as belonging. Finally, although the driver committed no traffic violation, the passengers were the expected number and orientation for an alien smuggling operation's return trip.

Rico-Soto highlights a couple of decisions, attempting to show the evidence is insufficient to demonstrate reasonable suspicion, but the evidence here is stronger than in those cases. In *United States v. Melendez-Gonzales*, 727 F.2d 407, 410-11 (5th Cir. 1984) agents stationed sixty miles north of the Mexican border saw a pickup truck followed by a heavily loaded automobile. They believed the cars were traveling in a lead car-load car pattern on a known smuggling route. The court found that insufficient for reasonable suspicion: "Riding low" is not given determinative weight; there was no evidence besides just seeing the cars close together to support that they were traveling as "lead car-load car"; there was no erratic driving or suspicious behavior from the passengers or tips from informants or features on the vehicle that made it a likely transport for illegal aliens. *Id.* at 412.

In *United States v. Moreno-Chaparro*, 180 F.3d 629, 631 (5th Cir. 1999), border patrol agents were also stationed sixty miles north of the Mexican border when a truck passed by their checkpoint and slowed, and the driver looked surprised to see the patrol car. The truck was registered to a woman, but the court found nothing strange about a man's driving a car registered to a woman. *Id.* at 632. The agent testified that Chevrolets in general were suspect, although he could find no reason to suspect that car in particular: no passengers, not modified in any obvious way, not riding low, and not overly clean or dirty. *Id.*

at 632-33.

The present case features stronger evidence pointing to reasonable suspicion than does either of those addressed above. First, the vehicles in those cases had no features that made them more likely than other similar vehicles to be transporting illegal aliens. Both decisions expressly state this fact. Here, Gill had learned from intel reports that vans labeled "Paisanos" were involved in transporting illegal aliens; that information had been gleaned from other persons making stops of such vans and finding illegal aliens.[4] That feature made this van even more suspicious than fifteen-passenger vans normally are, setting this case apart from the others.

Additionally, although it is not unusual for a man to be driving a car registered to a woman, or for a car to be headed toward the city in which it is registered, that does not make it common for a transportation company to be registering its vans in an individual woman's name rather than its own. Thus, Gill's testimony that vans used to transport illegal aliens are often registered to women rather than to the transportation company has more weight here than does the fact that a man was driving a Chevrolet registered to a woman did in *Moreno-Chaparro.* The fact that Rico-Soto was driving on Interstate 10 alone would not be too helpful, because it is the most direct route back to Houston, where the van is registered. It is more meaningful, however, when we add that the highway is a known alien-smuggling corridor and that the van was driving through at the proper time, with the expected number of people—who were sitting in the right

---

[4] The government cites numerous cases to show that Gill was entitled to rely on the intel reports, either under the collective-knowledge doctrine or otherwise. There is no need to address that, because Rico-Soto never argues that Gill should have been prohibited from relying on that information. The closest Rico-Soto gets to that contention is one sentence that states that Gill did not have personal knowledge that Paisano vans were transporting illegal aliens, but because Rico-Soto never argues that that makes the reliance impermissible, the statement is an attempt to reduce the weight this court gives to Gill's intel. Nonetheless, permitting Gill to use his knowledge from the intelligence report comports with previous decisions of this circuit. *See, e.g., Puac-Zamora*, 1995 WL 337783, at *1-2.

No. 09-30648

configuration—for a vehicle returning from dropping off illegal aliens on the Eastern Seaboard.

The identifying mark of "Paisanos" on the van, along with the intel reports explaining that such vans were transporting immigrants, plus multiple pieces of supporting evidence, distinguish this case from those where no reasonable suspicion was found. Here we had intel reports explaining "Paisanos" vans were transporting aliens, and a "Paisanos" van with suspicious registration driving a known immigrant-trafficking route at the time persons transporting illegal aliens would be expected to pass through that area. This confluence of facts, along with numerous small pieces of confirmatory evidence, justifies an agent with Gill's extensive experience in stopping Rico-Soto.

The judgment is AFFIRMED.