# United States Court of Appeals for the Fifth Circuit

No. 21-50904

CONSOLIDATED WITH

No. 21-50908

United States Court of Appeals
Fifth Circuit

**FILED**
September 21, 2023

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MARTIN BLAS CORTEZ,

*Defendant—Appellant.*

Appeals from the United States District Court
for the Western District of Texas
USDC Nos. 7:16-CR-1, 7:20-CR-227-1

Before STEWART, DENNIS, and HIGGINSON, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*: *

In July 2020, Odessa Police received a welfare call about an individual, Defendant Martin Cortez, seemingly asleep in a vehicle in a Denny's restaurant parking lot. This call triggered an extended traffic stop of Cortez, culminating a search of the vehicle which revealed two bullets. Cortez, who was indicted on one count of being a felon in possession of ammunition in

---

* This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 21-50904
c/w No. 21-50908

violation of 18 U.S.C. § 922(g)(1), filed a motion to suppress challenging this search on the basis that the officers had unlawfully prolonged his detention without reasonable suspicion. The district court denied this motion and, following a bench trial, convicted Cortez. Cortez appeals the denial of his motion to suppress. For the reasons given below, we AFFIRM.

I.

The morning of July 18, 2020, a Saturday, Odessa Police Corporal Taylor Box was dispatched to a Denny's restaurant parking lot to conduct a welfare check on a person passed out in a vehicle. Box arrived at 9:04 a.m. and encountered Defendant Martin Cortez asleep in the driver's seat of a black Chevy pickup truck. The windows were darkly tinted—to the point where it affected Box's ability to see into the car—and, as Box testified, not in compliance with Texas law. According to Box, when he first arrived at the Denny's, he suspected that he could be dealing with an intoxicated subject who was trying to sleep it off.

Box approached the vehicle and knocked on the driver's side window, waking Cortez up. Box then asked Cortez to roll down his window, but Cortez refused; instead, he rolled the window down slightly, just enough to pass through a Texas identification card.

After taking the identification card, Box requested that Cortez step out of the vehicle. Again, Cortez refused. At this point, Box requested assistance. A few minutes later, Corporal Reed Jones responded as backup, along with other officers.

For almost ten more minutes, Cortez remained in the vehicle despite the officers' repeated orders to exit. In the interim, the officers ran a warrant check on Cortez, and by 9:13 a.m., Box had confirmed that Cortez had no outstanding warrants. Although it is unclear exactly when, the officers would later learn, and Cortez confirm, that he had a history of drug possession

2

No. 21-50904
c/w No. 21-50908

charges, had state and federal firearms offenses in his record, and was on active supervised release at the time of this stop.

When an officer asked Cortez about his identification, Cortez did not have a driver's license, only an identification card. According to Cortez, he was in the process of obtaining a driver's license, but his application was complicated by the fact that he had several unpaid tickets. He admitted to driving without a license, saying that this was his only way to get to work.

Because Cortez continued to refuse to leave the truck, the officers sought permission from a supervisor to break the truck's driver's side window and physically remove Cortez. That request was denied. Finally, at 9:18 a.m., almost fifteen minutes after Box first approached, Cortez complied and exited the vehicle. The officers conducted a protective pat down and moved Cortez to the side of the truck.

Cortez told the officers he had stayed late at a friend's house the night before and had decided to rest at the Denny's parking lot rather than drive home tired. Box stated that he intended to check if Cortez was intoxicated, as individuals in this situation (sleeping in a parking lot early on a Saturday morning) are often trying to sober up from the night before. Although Cortez protested that he neither drank nor did drugs, Box pointed out that Cortez had a history of drug possession charges. Cortez admitted that was true, but nevertheless maintained that he was currently sober. When asked by another officer if he was "out of the game now," Cortez said that while he had, at some unspecified time in the past, failed a few drug tests and relapsed, he tried to get back on track. In response to further questions from the officers, Cortez admitted that he had been addicted to crack cocaine and previously used methamphetamine. Cortez, after being asked how long it had been since he had gotten clean, indicated that it had been "months" since he last used drugs.

No. 21-50904
c/w No. 21-50908

Following these disclosures, an officer asked Cortez if there was anything illegal in the vehicle and requested his consent to search the truck. Cortez replied that there was nothing illegal in the truck and refused consent to the search. Cortez had prior federal and state gun felony convictions. Specifically, in 2016, Cortez had been convicted of being a felon in possession of a firearm and sentenced to 21-months' imprisonment and three years of supervised release. Although Cortez's supervised release commenced on May 8, 2017, Cortez was in state custody from May 8, 2017 until October 29, 2018 in connection with a state conviction for possession of a controlled substance with intent to deliver and unlawful possession of a firearm by a felon. Cortez's federal supervised release was not running for the over 17 months he was in state custody. 18 U.S.C. § 3624(e); *United States v. Molina-Gazca*, 571 F.3d 470, 474 (5th Cir. 2009). Accordingly, Cortez's supervised release end date was October 28, 2021, meaning that he was on supervised release when the instant offense occurred on July 18, 2020. The officers continued to press for consent and suggested that Cortez's refusal could be a violation of his terms of supervised release.

At 9:28 a.m. Box informed Cortez that he was not going to be arrested for the offense of driving without a license unless they witnessed him driving off from the parking lot. Similarly, an officer indicated that while the dark tint on the truck's windows violated Texas law, Cortez would not be arrested at this time

At 9:29 a.m., however, the officers realized that the registration sticker on the truck did not match the license plate. An officer ran the plates and discovered that the vehicle was reported as stolen. Believing that Cortez was driving a stolen vehicle, the officers handcuffed him. Cortez told the officers that the truck had been stolen from his family and that they had filed a police report for the theft, but that the truck had since been recovered. Cortez told the officers that he had been instructed to leave the registration sticker and

4

plates on the truck until he received replacements. By 9:41 a.m., the officers confirmed that Cortez's mother was the owner of the vehicle, created an information report, and alerted Ward County to follow-up on the registration sticker.

Next, Box returned turned to the still-active investigation into whether Cortez was intoxicated. Within a few minutes, no later than 9:47 a.m., Box finished conducting field sobriety tests. Box observed no signs of intoxication.

Following Box's conclusion that Cortez was not intoxicated, Cortez remained handcuffed on the curb for just over ten minutes. At 9:59 a.m., Box moved Cortez from the curb into the back of a police car, explaining that he wanted to get Cortez out of the sun and into the air conditioning. When Cortez asked why he was still being detained, Box informed him that the officers were still looking into the registration sticker on the truck and that he had not complied with his parole.

The other reason for the detention, Box told Cortez at 10:04 a.m., was that the officers were "calling canine" to conduct an open-air sniff of the truck. Brandon Upchurch, a K-9 handler with Ector County ISD Police who conducted the sniff test, testified that he was called sometime around 10:00 a.m. According to Box, the officers suspected that there were drugs in the vehicle because Cortez kept refusing to consent to a search and had a history of being involved with narcotics. The canine sniff occurred at 10:12 a.m., and the dog alerted to the presence of narcotics on the driver's side door.

The officers then searched the vehicle. Although the search revealed no drugs, the officers discovered one .38 special caliber bullet and one .22 caliber bullet located on the floorboard of the driver's seat under a towel.

Cortez was arrested and ultimately indicted on one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).

Additionally, Cortez's probation officer filed a petition to revoke Cortez's supervised release, alleging that Cortez violated the condition prohibiting him from committing a new offense.

Cortez filed a motion to suppress, arguing that the officers lacked consent to search the vehicle and that they did not have reasonable suspicion to prolong his detention to allow time for the K-9 unit to arrive. An evidentiary hearing was held in connection with this motion, at which Box, Jones, and Upchurch testified and video evidence from the officers' bodycams was introduced. The district court denied the motion, finding that the officers had reasonable suspicion to extend Cortez's detention to wait for the dog.

Thereafter, the district court conducted a bench trial at which the parties agreed that the ruling on the motion to suppress was viable for appeal. In a signed and admitted stipulation, the parties agreed to the existence of facts sufficient to establish a violation of § 922(g)(1) if the prolonged detention was legal. Cortez was convicted and sentenced to 30 months of imprisonment followed by three years of supervised release. Furthermore, the district court revoked Cortez's supervised release and sentenced him to 18 months of imprisonment with no additional term of supervision. Cortez timely filed notices of appeal in each case, and the cases have now been consolidated on appeal.

## II.

Cortez challenges the denial of his motion to suppress, arguing that the officers detained him without reasonable suspicion beginning at 9:47

No. 21-50904
c/w No. 21-50908

a.m., when the officers concluded their investigation into whether he was intoxicated.[1]

When reviewing a district court's ruling on a motion to suppress, we review its conclusions of law, including the determination as to the existence of reasonable suspicion, *de novo* and its findings of fact for clear error. *United States v. Freeman*, 914 F.3d 337, 341 (5th Cir. 2019). A factual finding is "clearly erroneous only if a review of the record leaves this Court with a definite and firm conviction that a mistake has been committed." *United States v. Hearn*, 563 F.3d 95, 101 (5th Cir. 2009) (internal quotation marks and citation omitted). And "[t]he clearly erroneous standard is particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witness." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (internal quotation marks and citation omitted) (cleaned up). Additionally, we "review the evidence in the light most favorable to the prevailing party," here, the Government. *United States v. Santiago*, 410 F.3d 193, 197 (5th Cir. 2005).

The Fourth Amendment protects individuals against "unreasonable searches and seizures." U.S. CONST. amend. IV. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). The legality of a traffic stop is analyzed under the standard first articulated by the Supreme Court in *Terry v. Ohio*, 329 U.S. 1 (1968). *United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020). Under *Terry*, we "first examine whether the officer's action was justified at its inception, and then

---

[1] Cortez concedes that reasonable suspicion supporting the stop existed before this time, and the Government does not contest that this is the relevant time period for purposes of this appeal.

inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *United States v. Cavitt*, 550 F.3d 430, 435–36 (5th Cir. 2008) (internal quotation marks and citation omitted).

In the case of traffic stops, "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). However, "additional investigation unrelated to the safe and responsible operation of the vehicle" is permissible only "if that investigation does not lengthen the driver's detention or is supported by reasonable suspicion of additional criminal activity." *United States v. Reyes*, 963 F.3d 482, 487 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 861 (2020)). Thus, "if the officer develops reasonable suspicion of such activity in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed." *Id.* at 487–88 (internal quotation marks and citation omitted).[2]

To assess reasonable suspicion, courts "conduct[] a fact-intensive, totality-of-the-circumstances inquiry." *United States v. Rodriguez*, 564 F.3d 735, 741 (5th Cir. 2009). Requiring "more than merely an unparticularized hunch," *id.* (internal quotation marks and citation omitted), "[r]easonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010) (internal quotation marks and citation omitted). In

---

[2] Here, although Cortez was in his parked car at the time of the initial police encounter, both parties and the district court treat his detention as a traffic stop, presumably because Cortez was initially suspected of driving while intoxicated and the officers later developed probable cause that he had driven without a license.

considering the totality of the circumstances, "[f]actors that ordinarily constitute innocent behavior may provide a composite picture sufficient to raise reasonable suspicion in the minds of experienced officers." *United States v. Cervantes*, 797 F.3d 326, 329 (5th Cir. 2015). In sum, "[r]easonable suspicion is a low threshold, requiring only a minimal level of objective justification." *United States v. Alvarez*, 40 F.4th 339, 346 (5th Cir. 2022) (internal quotation marks and citation omitted).

Cortez does not dispute that the officers reasonably pursued *many* points of suspicion throughout the first forty-three minutes of the stop, including Cortez's illegally tinted windows, the possibility of trespass, his suspected intoxication, the false registration stickers on his truck, the report listing the vehicle as stolen, his lack of a valid driver's license, a potential supervised release violation, his admitted recent drug use, and his felony convictions. Still, Cortez contests that under the Fourth Amendment, it was unreasonable to prolong his detention while waiting for a K-9 unit to conduct a drug sniff.

Upon review of the record, we find no error. To begin, it is undisputed that throughout these twenty-five minutes, the officers had probable cause to arrest Cortez for two separate state offenses—the unlawful tint on the truck's windows and his admission that he had driven without a license. Although we do not embrace the Government's argument that *Rodriguez* is inapposite when probable cause to arrest exists, we recognize that these factors are nonetheless relevant to *Rodriguez's* reasonable suspicion analysis. Thus, we consider the truck's darkly tinted windows and Cortez's illegal driving only insofar as they help raise the officers' suspicion to "more than a hunch." *Allen v. Cisneros*, 815 F.3d 239, 246 (5th Cir. 2016).

Additionally, Cortez initially refused to exit his vehicle or to even roll down his tinted windows so that the officers could see into the truck. Indeed,

No. 21-50904
c/w No. 21-50908

it took almost fifteen minutes—to the point where the officers were considering breaking the window—for Cortez to comply with the officers' instructions. Even considering that Cortez subsequently exited the vehicle, this refusal supports the officers' suspicion that Cortez was hiding something illegal in his truck. *See Reyes*, 963 F.3d at 488–89 (listing a defendant's initial refusal to exit her truck as a factor supporting reasonable suspicion).

Finally, and importantly, during the stop Cortez confirmed his criminal history, which included multiple arrests for drug possession as well as state and federal felony convictions, and his current supervised release status, and admitted that he had abused drugs as recently as several months ago. This history and the considerations described above are enough to demonstrate that the officers had "more than a hunch" that Cortez possessed drugs. The district court did not err in denying the motion to suppress.

III.

We AFFIRM the district court.

10