# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 16, 2026

Lyle W. Cayce
Clerk

No. 24-40673

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JESUS ELOY GARCIA,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:22-CR-532-1

_____

Before ELROD, *Chief Judge*, and SMITH and WILSON, *Circuit Judges*.
JENNIFER WALKER ELROD, *Chief Judge*:

Defendant-Appellant Jesus Eloy Garcia argues on appeal that the Laredo Police Department conducted an unlawful investigatory stop and the district court erred in refusing to suppress the evidence gathered at that stop. Because the investigatory stop was supported by reasonable suspicion, Garcia's challenge fails. So do his remaining arguments, all of which are predicated on the stop's being unlawful. The district court's judgment is AFFIRMED.

No. 24-40673

I

On June 9, 2020, at approximately 3:19 a.m. in Laredo, Texas, a witness called emergency dispatch to report hearing "7 or 8 shots in the air." The witness described that the shots were fired from a "black SUV Cadillac" near 2201 E. Travis Street. That black Cadillac SUV, which had a missing right rear taillight, was headed south on Barlett Avenue.

Several officers from the Laredo Police Department (LPD) responded to the call. Two of them were Officers Christopher Morales and Magdalena Elizondo. The officers spoke with the witness who had called 911 and observed the shooting.[1] He clarified that it was the driver of the "dark-colored Cadillac SRX" who fired the shots. Over the next several hours, the officers on the scene located twelve nine-millimeter casings at the 3600 block of Barlett Avenue.

Shortly thereafter, at 3:53 a.m., Officer Christopher Garza, also of LPD, located a dark grey Cadillac SRX parked in a driveway at the 200 block of Park Avenue. The vehicle had a temporary paper license plate reading "711804." The vehicle was unoccupied, but the engine was warm. Garza reported the vehicle to dispatch. Dispatch responded that this same Cadillac SRX had been pulled over several days prior on June 4 by Officers Morales and Elizondo for a traffic stop. During that stop, Officers Morales and Elizondo identified the driver as Eduardo Joel Ciprian and his two passengers as Defendant Jesus Eloy Garcia and a minor named "O.L." The SUV had a paper license plate "71120F4" and a defective right taillight.

At 4:20 a.m., LPD released a be-on-the-lookout (BOLO) for the Cadillac believed to be involved in the shots-fired incident. In issuing the

---

[1] The record indicates that the witness is male but does not provide his name.

2

No. 24-40673

BOLO, police relied upon the eyewitness's account of the shooting incident, the information collected on Barlett Avenue, the information gathered by Officer Garza on Park Avenue, and the encounter with Officers Morales and Elizondo on June 4. Soon after, a more complete BOLO was issued, stating the following:

> On June 9, 2020, at 03:19, The Laredo Police Department Dispatch received three calls for shots fired within the general vicinity of East San José Street and Bartlett Avenue. Initial responding officers located 9MM casings at 2200 block of Travis. In addition, responding officers obtained information possible suspect vehicle is a 2011 Grey Cadillac SRX with paper plates 71120F4 with the right taillight out. Vehicle was located at the 200 block of Park unoccupied and remained at the scene. UTL on occupants. Recent traffic with vehicle indicates occupants as Eduardo Joel Ciprian DOB 07/13/94, O.L. DOB 03/12/04, and Jesus Eloy Garcia DOB 03/03/74. 10-0 subjects may be armed and have recent history of possession.[2]

Approximately twelve hours later, at 3:58 p.m. on June 9, LPD Captain Guadalupe Aselmo Ortiz was traveling north on Monterrey Avenue in Laredo when he noticed a grey Cadillac SRX with a paper license plate and three occupants. Ortiz remembered the BOLO that had been issued earlier that day. The vehicle stopped in front of a residence. Ortiz, in an unmarked vehicle but wearing a police uniform, stopped behind the SUV. He reported to dispatch that he was stopped behind the vehicle featured in the BOLO, then approached the SUV.

Ortiz engaged the vehicle's driver, who turned out to be Ciprian, and informed him that LPD had issued an alert for a grey Cadillac SRX related to

---

[2] The code 10-0 means to proceed with "caution."

a shots-fired incident. Given that he was outnumbered, Ortiz ordered the occupants to remain in the vehicle as he awaited backup. Backup arrived at 4:02 p.m.

Five officers arrived to assist Ortiz. Two of them were wearing bodycams that captured the interactions with the occupants. The occupants, Ciprian, Garcia, and an unnamed minor who was not O.L, were frisked. The officers ran a background check and discovered Ciprian had an outstanding warrant. Ciprian was taken into custody at 4:06 p.m. and the Cadillac was impounded.

The officers continued to question Garcia about the incident that had occurred in the early morning. At this point, Garcia was not free to leave. Garcia, who was then being questioned by an ATF Task Force Officer, explained that he did not know anything about the incident that occurred earlier that morning. At 4:34 p.m., Garcia was released. The stop lasted less than forty minutes.

Footage from the officers' bodycams was later used to make screenshots of Garcia. During the time of the stop, Garcia wore "distinctive jewelry." At the police station, Ciprian consented to his phone's being examined by the officers. Ciprian scrolled through the pictures on his phone with the officers. Several pictures contained a man in a ski mask posing with multiple firearms, including the pistol Ciprian admitted was used in the shots-fired incident.

The man in a ski mask wore the same "distinctive jewelry" that Garcia had on during the June 9 encounter with Captain Ortiz. The officers asked who owned the weapons shown in the pictures. Ciprian answered "Pollo," which is Garcia's nickname. LPD officers also recognized that Pollo's physical appearance in the pictures matched Garcia's appearance as noted during the *Terry* stop.

No. 24-40673

Law enforcement and prosecutors confirmed that Garcia had been convicted of five prior felonies. Relying on the bodycam screenshots from the traffic stop, the photos of Garcia with firearms, and Ciprian's related disclosure, federal prosecutors charged Garcia with being a felon in possession under 18 U.S.C. §§ 922(g)(1) and 924(a)(4).[3]

Garcia filed a motion to suppress the screenshots taken of him during the June 9 encounter. He contended that the *Terry* stop that led to the bodycam footage lacked reasonable suspicion and therefore violated the Fourth Amendment. Garcia asserted that the bodycam footage and screenshots had to be excluded under the "fruit of the poisonous tree doctrine." The district court determined that the *Terry* stop was supported by reasonable suspicion and denied Garcia's motion to suppress.

Garcia pleaded guilty to the felon-in-possession count. He maintained his right to appeal the denial of his motion to suppress. Garcia timely appealed.

II

When reviewing a denial of a motion to suppress evidence, factual findings are reviewed for clear error and the ultimate constitutionality of law-enforcement action is reviewed *de novo*. *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010) (citing *United States v. Perez*, 484 F.3d 735, 739 (5th Cir. 2007)). The district court's ruling on a motion to suppress should be

---

[3] Garcia was also charged with conspiracy to possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, its salts, isomers, and salts of isomers and cocaine base in violation of 21 U.S.C. §§846; 841(a)(1); and 841(b)(1)(c). He was also charged with managing and controlling a place and making it available for the purpose of unlawfully distributing and using cocaine, its salts, isomers, and salts of isomers and cocaine base in violation of 21 U.S.C. 856(a)(2). These charges are not at issue in this appeal.

5

upheld if there is any reasonable view of the evidence to support it. *United States v. Devaney*, 109 F.4th 322, 326 (5th Cir. 2024) (citation omitted).

### III

The issue is whether the district court erred in denying Garcia's motion to suppress on the basis that Captain Ortiz had no reasonable suspicion to engage in the June 9 investigatory stop. The parties agree that Ortiz relied on the BOLO as the basis for his investigative stop. The parties diverge, however, on whether the BOLO provided Ortiz with the reasonable suspicion needed to engage in this stop that ultimately led to Garcia's arrest and conviction.

Law enforcement may conduct an investigatory stop if there exists "reasonable and articulable suspicion that a person has committed a crime." *United States v. Roper*, 63 F.4th 473, 477 (5th Cir. 2023) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The reasonable-suspicion analysis considers the "totality of the circumstances" and examines whether the detaining officer had a "particularized and objective basis" for suspecting the individual of a crime. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "[A]n alert or BOLO report may provide the reasonable suspicion necessary to justify an investigatory stop." *United States v. Gonzalez*, 190 F.3d 668, 672 (5th Cir. 1999) (citing *United States v. Hensley*, 469 U.S. 221, 231–33 (1985)).

Garcia argues that the BOLO provided an insufficient basis for the stop because it relied solely on a witness report that a "black Cadillac SUV missing a right taillight" fired "7 or 8 shots in the air" at 2201 E. Travis Street in Laredo, Texas. However, the district court found that the "information in the BOLO was gathered from multiple sources: LPD's initial investigation of the shots-fired incident at 2201 E. Travis Street; Officer Garza's observation of a parked, grey Cadillac SRX at 200 block of Park

Avenue; and the June 4 traffic stop involving Officers Morales and Elizondo, and the suspects Ciprian, Defendant, and O.L." Garcia conceded at oral argument that LPD relied on these sources when issuing the BOLO.

This concession undercuts Garcia's primary argument that the BOLO lacked the specificity necessary to provide Ortiz with reasonable suspicion. He asserts that BOLO lacked specificity because it relied only upon the witness who reported to dispatch that "7 or 8 shots" were fired from a "black Cadillac missing a right taillight." However, as stated, LPD relied on not only the eyewitness's account, but also the investigative work done on Barlett, Garza's report concerning the vehicle on Park Street, and the June 4 traffic stop.

LPD's police work led it to issue a BOLO containing considerable detail about the suspected vehicle. The BOLO noted the vehicle's color, year, make, model, and license plate number. It also noted that the vehicle had "paper plates." We have previously determined that BOLOs with a similar degree of specificity provided law enforcement with reasonable suspicion to conduct a *Terry* stop. *See, e.g.*, *Gonzalez*, 190 F.3d at 671 (crediting that the "nearly exact match between the Gonzalez' car and the car described in the BOLO"); *United States v. Bustamante*, 478 F. App'x 922, 925 (5th Cir. 2012) (crediting the "specifics about the truck, such as the color, license plate number, and driver"); *United States v. Rodriguez*, 564 F.3d 735, 742 (5th Cir. 2009) (crediting the "BOLO's identification of a car by its make, model, body style").

Garcia also argues that the BOLO could not have provided Captain Ortiz with reasonable suspicion because LPD did not act with "collective

knowledge" when conducting the investigatory work that led to the BOLO.[4] However, this contention is belied by the record, which shows that the officers involved in the shots-fired incident received information from dispatch and through their computers located in their police vehicles. This communication exceeds the collective knowledge doctrine's "some degree of communication" requirement. *Webster*, 750 F.2d 307, 323 (5th Cir. 1984).

For all of these reasons, the BOLO properly provided Ortiz with reasonable suspicion to conduct the investigatory stop.

Given that Ortiz had reasonable suspicion to conduct the *Terry* stop, Garcia's remaining arguments fail. His claims that the bodycam footage should be suppressed and that he had some sort of "subjective expectation of privacy" are entirely predicated on the *Terry* stop's being unlawful. Ortiz's investigative stop was lawful, and Garcia offers no other basis for the evidence to be suppressed.

\* \* \*

The district court's judgment is AFFIRMED.

---

[4] In *United States v. Wright*, this court clarified there are two concepts "loosely labeled the collective knowledge doctrine." 74 F.4th 722, 731 (5th Cir. 2023) (quoting *United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984)). The concept applicable here applies when "the arresting officer has personal knowledge of the facts which, standing alone, do not establish probable cause but, when added to information known by other officers involved in the investigations, tips the balance in favor of the arrest." *Id.* (quoting *Webster*, 74 F.2d at 323).